# UNITED STATES *v.* WITTEK.

No. 473.  Argued April 20–21, 1949.—Decided June 13, 1949.

*Assistant Attorney General Vanech* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Philip Elman, Roger P. Marquis, Fred W. Smith* and *Floyd L. France.*

*Ward B. McCarthy* argued the cause and filed a brief for respondent.

MR. JUSTICE BURTON delivered the opinion of the Court.

The question presented is whether the United States, as the owner of Bellevue Houses, a defense-housing project in the District of Columbia, is a "landlord" within the meaning of the District of Columbia Emergency Rent Act,[1] with particular reference to rights of occupancy and rates of rental. For the reasons to be stated, we hold that it is not.

---

[1] The District of Columbia Emergency Rent Act was approved December 2, 1941, 55 Stat. 788, D. C. Code (1940, Supp. VI) §§ 45–1601 to 45–1611. It took effect January 1, 1942, and was to terminate December 31, 1945. *Id.* §§ 2 (1), 1 (b) ; § 45–1602 (1) ; and see § 45–1601 (b). Its life, however, was extended to December 31, 1946, 59 Stat. 592; to December 31, 1947, 60 Stat. 340; to March 31, 1948, 61 Stat. 713; to April 30, 1948, 62 Stat. 100; to March 31, 1949, 62 Stat. 205; to April 30, 1949, 63 Stat. 30; to June 30, 1950, 63 Stat. 48. It has been amended in a few other provisions, none of which are material here.

The United States of America, petitioner herein, filed its amended complaint in the Municipal Court for the District of Columbia against Wittek, the respondent, seeking possession of the premises occupied by him in the defense-housing project in the District of Columbia known as Bellevue Houses. The complaint alleged that the premises were owned by the United States and that the housing accommodations had been constructed by the Navy Department under authority of § 201 of the Second Supplemental National Defense Appropriation Act, 1941.[2] This summary proceeding was brought under § 20, 31 Stat. 1193, 41 Stat. 555, D. C. Code (1940) § 11-735. The respondent's tenancy had been terminated by notice to quit, served upon him February 28, 1946, as required by § 1219, 31 Stat. 1382, D. C. Code (1940) § 45-902, and the United States claimed that he no longer had any right to possession.[3] The respondent's defense, now be-

---

[2] Approved September 9, 1940, 54 Stat. 883-884. The management and administration of Bellevue Houses were transferred by the Navy Department to the National Housing Administration under authorization of this section and also under § 7 of the Lanham Act, approved October 14, 1940, 54 Stat. 1125, 1127, 42 U. S. C. (1946 ed.) § 1544, and Executive Order No. 9070, 3 C. F. R. Cum. Supp. 1095, 50 U. S. C. App. (1946 ed.) § 601 note, p. 5711. The authority to operate and manage Bellevue Houses later was delegated, by lease, to the National Capital Housing Authority, which was responsible for the rental of the premises involved in the instant case at the time of this proceeding. In making this delegation, the United States relied upon the same Acts, together with § 5 of the Act of June 28, 1941, 55 Stat. 363, and amendments made to the Lanham Act by the Act of January 21, 1942, 56 Stat. 11, et seq.

[3] The amended complaint, the proceedings and the opinions below refer also to allegations, stipulations and evidence to the effect that the United States had rented the premises in question to the respondent for $38.20 a month, including gas heating and other utility services, but that it had increased such rental to $43 a month, beginning February 1, 1946. The United States claimed that this increase was essential in order for it to meet a substantial rise in operating expenses, due to the necessary substitution of commercial gas to

fore us, is that the United States did not establish any of the additional facts which the District of Columbia Emergency Rent Act required a landlord to establish as a condition of such landlord's recovery of possession of housing accommodations to which the Act applied.[4]  The.

be used for space heating purposes in place of surplus sludge gas supplied by the District of Columbia free or at nominal cost.  The United States also alleged that the respondent refused to execute a new lease and refused to pay rent at the increased rate, with the result that, on February 28, 1946, it served its 30-day notice terminating the respondent's tenancy.  It further alleged that this increase in rent had been made under its previously cited authority to operate the project and without reference to the District of Columbia Emergency Rent Act.  This increase in rent presents (under §§ 2 to 4 of that Act, D. C. Code (1940, Supp. VI) §§ 45–1602 to 45–1604) the same issue, based upon the applicability of the Act to the United States as a landlord, as is presented (under § 5 (b), D. C. Code (1940, Supp. VI) § 45–1605 (b)) by the maintenance of this proceeding for possession of the premises in question without making any of the additional allegations called for by that Act.  We deal with the issue as presented under § 5 (b) because it is there less involved in factual controversy than it is under §§ 2 to 4.

[4] "SEC. 5. PROHIBITIONS.—. . .

"(b) No action or proceeding to recover possession of housing accommodations shall be maintainable by any landlord against any tenant, notwithstanding that the tenant has no lease or that his lease has expired, so long as the tenant continues to pay the rent to which the landlord is entitled, unless—

"(1) The tenant is (a) violating an obligation of his tenancy (other than an obligation to pay rent higher than rent permitted under this Act or any regulation or order thereunder applicable to the housing accommodations involved or an obligation to surrender possession of such accommodations) or (b) is committing a nuisance or using the housing accommodations for an immoral or illegal purpose or for other than living or dwelling purposes, or

"(2) The landlord seeks in good faith to recover possession of the property for his immediate and personal use and occupancy as a dwelling, or

"(3) The landlord has in good faith contracted in writing to sell the property for immediate and personal use and occu-

parties agreed that the cause be disposed of by the
Municipal Court upon the pleadings, pretrial stipulations
and certain exhibits. That court found that it had juris-
diction, that the Emergency Rent Act did not apply to
the United States as the landlord of the premises in
question and it ordered possession of the premises to be
given to the United States. The Municipal Court of
Appeals for the District of Columbia affirmed the judg-
ment.[5] The United States Court of Appeals for the Dis-
trict of Columbia Circuit allowed an appeal, limited to
two questions.[6] It disposed of one by sustaining the juris-

pancy as a dwelling by the purchaser and that the contract of
sale contains a representation by the purchaser that the property
is being purchased by him for such immediate and personal use
and occupancy, or

"(4) The landlord seeks in good faith to recover possession
for the immediate purpose of substantially altering, remodeling,
or demolishing the property and replacing it with new construc-
tion, the plans for which altered, remodeled, or new construction
having been filed with and approved by the Commissioners of
the District of Columbia, or

"(5) The housing accommodations are nonhousekeeping, fur-
nished, accommodations located within a single dwelling unit
not used as a rooming or boarding house as defined by this Act
and the remaining portion of which dwelling unit is occupied
by the lessor or his immediate family, or

"(6) The landlord, being a recognized school or an accredited
nonprofit university, has a bona fide need for the premises for
educational, research, administrative, or dormitory use." 55
Stat. 791, 56 Stat. 759, 61 Stat. 721, D. C. Code (1940, Supp.
VI) § 45–1605 (b).

[5] *Wittek* v. *United States,* 54 A. 2d 747. For an earlier proceeding
in the same case, see *United States* v. *Wittek,* 48 A. 2d 805.

[6] Appeal was taken under 56 Stat. 196, D. C. Code (1940, Supp.
VI) § 11–773. The question now before us was stated as follows:
"Whether the conditions imposed by the District of Columbia Emer-
gency Rent Act on suits for possession apply where such a suit is
brought by the United States as landlord." *Wittek* v. *United States,*
83 U. S. App. D. C. 377, 378, 171 F. 2d 8, 9.

diction of the Municipal Court. It answered the other by holding that the District of Columbia Emergency Rent Act did apply to the United States as the landlord in this proceeding. It ordered the judgment reversed and the cause remanded to the Municipal Court of Appeals. 83 U. S. App. D. C. 377, 171 F. 2d 8. We granted certiorari because of the substantial importance of the decision to the administration of Government-owned, low-rent housing, as well as to Government-owned, defense housing, in the District of Columbia. 336 U. S. 931.

I. *If the District of Columbia Emergency Rent Act is now applied to Government-owned, defense housing in the District, such as Bellevue Houses, we are warned that we soon may be compelled to hold the same interpretation applicable to Government-owned, low-rent housing in the District.*

When the circumstances are appreciated, it is practically inconceivable that Congress would have subjected its Government-owned, *low-rent housing* program in the District of Columbia to the additional control prescribed by the District of Columbia Emergency Rent Act. Yet the interpretation by which the court below held that Act applicable to the United States as a landlord of *defense housing* might make the Act equally applicable to the United States as a landlord of all other housing accommodations, including its *low-rent housing*. The District of Columbia Emergency Rent Act came before Congress, late in 1941, through and with the support of the Congressional Committees on the District of Columbia in the House of Representatives and the Senate. It was designed as a model, prewar, temporary, emergency measure to forestall the skyrocketing of rentals of housing accommodations for defense workers then concentrating in the District of Columbia. Obviously, it was directed, at least

primarily, at private landlords.[7]   It sought to stabilize housing rentals at about the level of January 1, 1941, which it selected as "a level fixed (so far as practicable) by free competition; . . . ."[8]

---

[7] "SECTION 1. PURPOSES, TIME LIMIT.—(a) It is hereby found that the national emergency and the national-defense program (1) have aggravated the congested situation with regard to housing accommodations existing at the seat of government; (2) *have led or will lead to profiteering and other speculative and manipulative practices by some owners of housing accommodations;* (3) *have rendered or will render ineffective the normal operations of a free market in housing accommodations;* and (4) are making it increasingly difficult for persons whose duties or obligations require them to live or work in the District of Columbia to obtain such accommodations.   Whereupon it is the purpose of this Act and the policy of the Congress during the existing emergency to prevent undue rent increases and any other practices relating to housing accommodations in the District of Columbia which may tend to increase the cost of living or otherwise impede the national-defense program.

"(b) The provisions of this Act, and all regulations, orders, and requirements thereunder, shall terminate on December 31, 1945; . . . ." (Emphasis supplied.)   55 Stat. 788, D. C. Code (1940, Supp. VI) § 45–1601.

In seven steps the termination date has been extended to June 30, 1950.   See note 1, *supra.*

[8] The Committee Reports refer by implication to private landlords, rather than to the United States—either as the established landlord of the widespread, low-rent housing in the District or as the landlord of the future defense housing then being developed in the District, by the United States as an additional means of combating the housing shortage.

"With a population influx at a higher rate than ever before in its history, the Nation's Capital today is faced with a demand for housing accommodations which threatens to create a situation more serious than that existing during the last war.   The present demand for living quarters on the part of those whom the defense effort requires to live and work in Washington, *has tempted some owners and managers of rental properties to demand exorbitant rentals.* It is true, and gratifying to note, that a large majority of owners and managers have refrained from taking advantage of the rental situation created by the national emergency as it affects the Nation's

Congress traditionally has relied heavily upon its Committees on the District of Columbia in District matters. Through them it must have seen this measure in the light of its own long-term, low-rent housing program for the District. In appraising the attitude of these Committees and of Congress toward Government-owned, low-rent housing as a substitute for substandard housing in the District, it is impossible to overemphasize either the seriousness of the need or the long-standing concern of Congress about that need. The substandard housing in the District has been a frequent subject of congressional debate, study and legislation since the Civil War. The narrow alleys in the interior of 200 or more of the large downtown city blocks of the District, although unfit for habitation, have been notoriously congested with a

Capital. *This bill is designed to protect this group as well as present and future tenants in the District of Columbia from the rent-gouging practices of a minority of landlords.*

*"The most appropriate regulation of rental properties to meet the present emergency-situation is regulation designed to stabilize the rent level at a level fixed (so far as practicable) by free competition;* competition before it was seriously affected by an acute housing shortage and by restrictions on new construction caused by shortages in certain building materials required by the military needs of the Nation.

"It is particularly appropriate that the Congress immediately enact legislation of this type for the Nation's Capital—legislation that may serve as a model for enactments by States which may desire control for those areas within their borders suffering from similar rental housing dislocations caused by the national emergency and the national-defense program." (Emphasis supplied.) H. R. Rep. No. 1317, 77th Cong., 1st Sess. 2, 6 (1941).

And see S. Rep. No. 827, 77th Cong., 1st Sess. 3 (1941). See also, discussion of the bill on the floor of the House of Representatives by Representative Randolph of West Virginia, Chairman of the Committee on the District of Columbia, 87 Cong. Rec., Pt. 8, 8447–8454 (1941).

large population for which adequate housing never has existed. This condition has been widely publicized and only partial success has been attained through the efforts to improve it. Out of this need there has evolved a long-term congressional program to eliminate these substandard dwellings. Due to an obvious lack of suitable private housing, this program has led to the construction of a number of Government-built, owned and operated low-rent housing accommodations. In 1934, Congress enacted the District of Columbia Alley Dwelling Act, 48 Stat. 930, D. C. Code (1940) § 5–103, *et seq.* It authorized the President to acquire land adjacent to the inhabited alleys in the District, erect buildings thereon and rent them "upon such terms and conditions as he may determine: . . . ." [9] Pursuant to this Act, he designated the Chairman (officially entitled the President) of the Board of Commissioners of the District of Columbia, the

---

[9] The nature of the need was reflected in the original statement of the purpose of the Act.

". . . to enable the President, *in the interest of public health, comfort, morals, safety, and welfare,* to provide for the discontinuance of the use as dwellings of buildings situated in alleys *and to eliminate the hidden communities in inhabited alleys of the District of Columbia,* and to carry out the policy declared in the Act approved May 16, 1918, as amended, of *caring for the alley population of the District of Columbia,* the President is hereby authorized and empowered, . . . —

"(a) To purchase, or acquire by condemnation or gift, any land, buildings, or structures, or any interest therein, situated in or adjacent to any inhabited alley in the District of Columbia, . . . ; ·

"(b) . . . to demolish, move, or alter any buildings or structures situated thereon and erect such buildings or structures thereon as deemed advisable: . . . ;

"(c) *To lease, rent, maintain, equip, manage,* exchange, sell, or convey any *such lands, buildings, or structures upon such terms and conditions as he may determine:* . . . ." (Emphasis supplied.) 48 Stat. 930–931.

See also, 52 Stat. 1186, D. C. Code (1940) § 5–103.

Executive Officer (later the Director) of the National
Capital Park and Planning Commission and the Director
of Housing of the Federal Emergency Administration of
Public Works to carry out its purposes.   He named the
group The Alley Dwelling Authority.[10]   In 1938, he sub-
stituted the Architect of the Capitol for the third official
constituting the Authority,[11] and, in 1943, he changed its
name to that of the National Capital Housing Authority.[12]
It is this presidentially designated Authority that has
operated, for the United States, all of its low-rent housing
projects in the District.   It is this Authority that has
fixed the rentals and passed upon the respective rights of
tenants to occupy premises in those projects.   Its com-
position, including two United States officials and the
President of the Board of Commissioners of the District,
demonstrates the incongruity of an attempt, such as is
here suggested, to subject it to the control of the District's
Administrator of Rent Control, himself appointed by the
Board of Commissioners of the District.   The recognized
responsibility of this Authority as a federal housing
agency further appears from the fact that, in due course,
it was chosen by the Government to be the operating
lessee of more than 5,000 Government-owned, defense-
housing, dwelling units, which were built by the United
States in or near the District, including the Bellevue
Houses.

The issue before us does not turn upon what particular
agency is operating the Bellevue Houses or the other Gov-
ernment-owned housing of the United States.   The issue

---

[10] Executive Order No. 6868, October 9, 1934 (published in Report
of the National Capital Housing Authority for the Ten-Year Period
1934–1944, p. 3), and see Executive Order No. 8033, 3 C. F. R. Cum.
Supp. 443.   This was pursuant to the authorization contained in 48
Stat. 931, D. C. Code (1940) § 5–104.

[11] Executive Order No. 7784–A, 3 Fed. Reg. 51 (1938).

[12] Executive Order No. 9344, 3 C. F. R. Cum. Supp. 1279.

is whether the United States, through whatever agency it operates, is to be controlled in its rental policies by the District Administrator of Rent Control. In determining the meaning of the District of Columbia Emergency Rent Act, approved December 2, 1941, which created the District Administrator of Rent Control, it therefore is material to note that the United States, in 1941, already was acting as a landlord of much Government-owned housing in the District and that, in each instance, it had placed those operations in the control of a national or presidentially designated authority or official with authorization fitted to the particular and varied purposes of that housing. This fact is of crucial significance in connection with the low-rent housing in the District which had been in operation for several years. Its distinctly social welfare and relief purposes already were in the hands of The Alley Dwelling Authority.

Beginning in 1934, The Alley Dwelling Authority built and put into operation five Government-owned, low-rent housing projects (including 112 dwelling units) and three commercial properties.[13] In 1938, Title II was added to the District of Columbia Alley Dwelling Act, 52 Stat. 1188, D. C. Code (1940) § 5-112, et seq., and the Authority was designated also as a public housing agency to carry out the purposes of the United States Housing Act of 1937, 50 Stat. 888, et seq. See 42 U. S. C. (1940 ed.) § 1401, et seq. This enabled it to secure loans to build low-rent housing accommodations and its program promptly expanded. By the end of 1941 it had com-

---

[13] For this and the other factual material relating to this Authority, see Report of the National Capital Housing Authority for the Ten-Year Period 1934–1944, submitted by it to the President December 28, 1944, and by him to Congress March 1, 1945, 91 Cong. Rec., Pt. 2, 1597 (1945). See also, the Annual Reports of this Authority to the President, all required by § 5 (a) and (b) of the District of Columbia Alley Dwelling Act, 48 Stat. 932, D. C. Code (1940) § 5-107 (a) and (b).

pleted, under Title II, six more low-rent projects, including 1,613 dwelling units, and the Government's brief in the instant case states that it is now managing, under that Title, 3,147 such dwellings. The character of these dwellings is plain from the definition of "low-rent housing" in the Housing Act.[14] This was prewar, poor-relief, low-rent housing, rather than defense housing. These projects were subsidized. The rentals were keyed to the inadequacy of the income of the respective tenants. The rentals did not purport to equal the level of those fixed by free competition for comparable privately owned housing. It was an important feature of the operating policy of these projects that a tenant be dispossessed, or "graduated" as the Authority termed it, whenever that tenant's financial needs no longer entitled him to the subsidized privileges. The inappropriateness of applying to such projects rentals based upon levels fixed by free competition as of January 1, 1941, under the District of Columbia Emergency Rent Act, is evident. That Act's policy of rent control fostered the continuance of tenancies regardless of the financial status of the individual tenant. If applied to low-rent housing it would give vested rights to relief clients once installed, rather than to new clients in greater need. In the absence of an express statement by Congress, it is not conceivable that Congress, with its

---

[14] "SEC. 2. When used in this Act—

"(1) The term 'low-rent housing' means decent, safe, and sanitary dwellings within the financial reach of families of low income, and developed and administered to promote serviceability, efficiency, economy, and stability, and embraces all necessary appurtenances thereto. *The dwellings in low-rent housing as defined in this Act shall be available solely for families whose net income at the time of admission does not exceed five times the rental* (including the value or cost to them of heat, light, water, and cooking fuel) of the dwellings to be furnished such families, except that in the case of families with three or more minor dependents, such ratio shall not exceed six to one." (Emphasis supplied.)    50 Stat. 888, 42 U. S. C. (1940 ed.) § 1402 (1).

familiarity with these relief operations of the United States as the landlord of such *low-rent, relief housing,* would subject The Alley Dwelling Authority in the rental policy of such housing to the control of a local Administrator of Rent Control under an Act designed to meet the problems of employed war workers rather than the problems of indigent families, already wholly or partially dependent upon public support. Such a subjection, however, apparently would follow from the reasoning of the court below that the use by Congress of the general term "landlord," in the District of Columbia Emergency Rent Act, must subject the United States, as the landlord of Government-owned, *defense-housing accommodations,* to the provisions of that Act. The District of Columbia Emergency Rent Act makes no distinction between the United States as a landlord of low-rent housing and as a landlord of defense housing. If the Act applies to the Bellevue Houses, it apparently may be applied equally to all of the activities of the United States as a landlord. Therefore, while the complaint in the instant case does not seek to dispossess a tenant of a Government-owned, low-rent housing unit, we note the warning of Government counsel that, if we hold that the District of Columbia Emergency Rent Act is applicable in the instant case, we soon may be compelled to hold it applicable also to the United States as the landlord of low-rent housing.

II. *The District of Columbia Emergency Rent Act does not apply to Government-owned, defense housing in the District, such as the Bellevue Houses.*

A. *The Act contains no express reference to the United States as a landlord or to the application of the Act to Government-owned housing of any kind.*[15] A general

---

[15] This contrasts with the language used by Congress about two months later in the rent control provisions of the National Emergency Price Control Act of 1942, 56 Stat. 24–26, 36–37. Congress there

statute imposing restrictions does not impose them upon the Government itself without a clear expression or implication to that effect.[16] The text, surrounding circumstances and legislative history of this District Act neither express nor imply a change in the authority already

expressly included the United States in the definition of "person." See p. 365, *infra*.

The court below relies particularly upon the following definitions of "landlord" and "person" in the District of Columbia Emergency Rent Act as being sufficiently broad to include the United States when read in the light of the purposes of the Act:

"SEC. 11. DEFINITIONS.—As used in this Act—

"(g) The term 'landlord' includes an owner, lessor, sublessor, or other person entitled to receive rent for the use or occupancy of any housing accommodations.

"(h) The term 'person' includes one or more individuals, firms, partnerships, corporations, or associations and any agent, trustee, receiver, assignee, or other representative thereof." 55 Stat. 794–795, D. C. Code (1940, Supp. VI) § 45–1611 (g) and (h)..

[16] ". . . There is an old and well-known rule that statutes which in general terms divest pre-existing rights or privileges will not be applied to the sovereign without express words to that effect. It has been stated, in cases in which there were extraneous and affirmative reasons for believing that the sovereign should also be deemed subject to a restrictive statute, that this rule was a rule of construction only. Though that may be true, the rule has been invoked successfully in cases so closely similar to the present one, and the statement of the rule in those cases has been so explicit, that we are inclined to give it much weight here." *United States* v. *United Mine Workers*, 330 U. S. 258, 272–273.

See also, *United States* v. *Wyoming*, 331 U. S. 440, 449; *United States* v. *Stevenson*, 215 U. S. 190, 197; *United States* v. *American Bell Telephone Co.*, 159 U. S. 548, 554–555; *United States* v. *Herron*, 20 Wall. 251, 263.

"The most general words that can be devised (for example, any person or persons, bodies politic or corporate) affect not him [the King of England] in the least, if they may tend to restrain or diminish any of his rights and interests. . . . The rule thus settled respecting the British Crown is equally applicable to this government, and it has been applied frequently in the different States, and prac-

vested in permanent federal agencies in their manage-
ment of the Government-owned housing in the District.
The District of Columbia Emergency Rent Act thus ap-
pears to have been enacted as a temporary measure sup-
plementing, rather than superseding, the contribution
already being made by the permanent federal housing
authorities toward meeting the housing crisis. We find
no evidence that Congress believed that the managers of
any of its housing projects in the District would be
"tempted . . . to demand exorbitant rentals" or engage
in the "rent-gouging practices . . ." against which the
new Act was directed.[17]   It seems obvious that the need
for District rent control was not in the operation of Gov-
ernment-owned housing, where the Federal Government
already had complete control over the rentals, but was
in the operation of privately owned housing, where neither
the Federal nor District Government had any control.

B. *Government-owned, defense housing did not require
the new rental control, in the District, that Congress im-
posed upon privately owned housing by the District of
Columbia Emergency Rent Act.*   The increasing number
of Government-owned, defense-housing units testified to
the satisfaction of Congress and of the Administration
with such projects. Rental rates in them were under
complete governmental control. At the time of the en-
actment of the District of Columbia Emergency Rent Act,
December 2, 1941, defense housing could be constructed
in the District, and elsewhere, under § 201 of the Sec-
ond Supplemental National Defense Appropriation Act,

---

tically in the Federal courts. It may be considered as settled that
so much of the royal prerogatives as belonged to the King in his
capacity of *parens patriæ*, or universal trustee, enters as much into
our political state as it does into the principles of the British con-
stitution." *Dollar Savings Bank* v. *United States*, 19 Wall. 227,
239.

[17] See note 8, *supra*.

1941, approved September 9, 1940, 54 Stat. 872, 883, or under the Lanham Act, approved October 14, 1940, 54 Stat. 1125.[18] Bellevue Houses were built by the Navy under the first of those Acts. The rent control of defense housing under that Act was, in the first instance, expressly vested in the discretion of the Secretary of War or of the Navy, and the tenants were restricted to war workers.[19] This provision was amended, June 28, 1941, so as to give to the agencies administering that housing the same powers and duties as had been given to the Federal Works Administrator as to defense housing constructed under the Lanham Act.[20] The rental policy under the Lanham Act,

[18] Supplemented by the Urgent Deficiency Appropriation Act, 1941, approved March 1, 1941, 55 Stat. 14, and amended by the Acts of April 29, 1941, 55 Stat. 147, and June 28, 1941, 55 Stat. 361, et seq.

[19] ". . . in carrying out the purposes of this section the Secretary of War and the Secretary of the Navy may utilize such other agencies of the United States as they may determine upon: *Provided further,* That the Secretary of War and the Secretary of the Navy, at their discretion, are hereby authorized to rent such housing units, upon completion, to enlisted men of the Army, Navy, Marine Corps with families, to field employees of the Military and Naval Establishments with families, and to workers with families who are engaged, or to be engaged, in industries essential to the military and naval national defense programs, including work on ships under the control of the Maritime Commission. . . ." § 201, Second Supplemental National Defense Appropriation Act, 1941, approved September 9, 1940, 54 Stat. 883–884. For comparable classification of eligible tenants under the Lanham Act, see § 2, 54 Stat. 1126, as amended, 56 Stat. 11–12, 42 U. S. C. (1946 ed.) § 1522.

[20] "Sec. 5. The departments, agencies, or instrumentalities administering property acquired or *constructed under section 201 of the Second Supplemental National Defense Appropriation Act, 1941, shall have the same powers and duties with respect to such property and with respect to the management, maintenance, operation, and administration thereof as are granted to the Federal Works Administrator with respect to property acquired or constructed under title I of such Act of October 14, 1940,* and with respect to the management, maintenance, operation, and administration of such property so ac-

at that time, provided: *"That the [Federal Works] Ad-ministrator shall fix fair rentals, on projects developed pursuant to this Act, which shall be within the financial reach of persons engaged in national defense: . . . ."* (Emphasis supplied.) § 7, 54 Stat. 1127, renumbered § 304, 55 Stat. 363. This rental policy was thus expressly fitted to the purposes of the defense housing. Those purposes did not call for its further subordination to the control of a District Administrator of Rent Control under other statutory standards fitted to private landlords. This special defense-housing rental policy was further expressly emphasized by Congress in another amendment made applicable to the Lanham Act defense housing January 21, 1942.[21] Therefore, whether or not these further provisions were also to be applicable to Bellevue Houses, which had been constructed under an earlier Act, they became applicable to the many Government-owned, defense-housing units constructed in the District under the Lanham Act. Congress thus evidenced its purpose to insist upon special standards of rentals for its defense housing. It is significant that it did so by Acts approved June 28, 1941, and January 21, 1942. One was enacted

---

quired or constructed under such title." (Emphasis supplied.) 55 Stat. 363.

Title I of the Lanham Act, approved October 14, 1940, consisted of §§ 1–3, and in the Act of June 28, 1941, it was given the title "Defense Housing." 55 Stat. 361.

[21] "SEC. 6. The second proviso of section 304 of such [Lanham] Act, as amended, is amended to read as follows: *'Provided further, That the [Federal Works] Administrator shall fix fair rentals, on projects developed pursuant to this [Lanham] Act, which shall be based on the value thereof as determined by him, with power during the emergency, in exceptional cases, to adjust the rent to the income of the persons to be housed, and that rentals to be charged for Army and Navy personnel shall be fixed by the War and Navy Departments.'"* (Emphasis supplied.) 56 Stat. 12, 42 U. S. C. (1946 ed.) § 1544.

before, and the other after, the enactment of the District of Columbia Emergency Rent Act on December 2, 1941. This emphasis was repeated on April 10, 1942, in a manner which demonstrated still further that Congress, in its consideration of the Lanham Act, had not overlooked the substantial extent to which that Act related to the construction of defense housing in the District of Columbia. On that date Congress amended the Lanham Act with special reference to operations in the District. It added Title IV. This authorized a $30,000,000 appropriation "to provide housing in or near the District of Columbia (including living quarters for single persons and for families) for employees of the United States whose duties are determined by the National Housing Administrator to be essential to national defense and to require them to reside in or near the District of Columbia." 56 Stat. 212, 42 U. S. C. (1946 ed.) § 1561. The rental control provisions amended on January 21, 1942 (see note 21, *supra*), already were applicable to such housing. The very § 304 which contained those amended rental control provisions was further amended so as expressly to include the District of Columbia in the term "local municipalities" to which land could be conveyed for street or other public use incidental to a project. See 54 Stat. 1127, 55 Stat. 363, 56 Stat. 212, 42 U. S. C. (1946 ed.) § 1544.[22]

In the light of the foregoing express provisions for the control of rents in the public interest on Government-owned, defense-housing projects, there is no ground for implication that the District of Columbia Emergency Rent Act conflicts with it.

---

[22] As evidencing a purpose that Government-owned, defense housing constructed under the Lanham Act likewise remain under the general civil and criminal jurisdiction of the respective states and of the District of Columbia, wherever such housing might be located, § 307 of the Lanham Act was amended by the Act of April 10, 1942, to include expressly the District of Columbia. See 54 Stat. 1127, 55 Stat. 363, 56 Stat. 212, 42 U. S. C. (1946 ed.) § 1547.

III. *The National Emergency Price Control Act of 1942 emphasizes the conclusion that the District of Columbia Emergency Rent Act does not apply to Government-owned housing in the District.*

Although the National Emergency Price Control Act of 1942, approved January 30, 1942, expressly empowered the National Price Administrator, under certain limitations, to establish maximum rentals in so-called defense-rental areas,[23] he never did so in the District of Columbia. That Act, therefore, does not have a direct application to the issue in this case. However, the language of that Act and its policy toward the rent control of Government-owned, housing accommodations, both inside and outside of the District of Columbia, has a bearing upon the proper construction of the District of Columbia Emergency Rent Act. The National Act is not only consistent with our interpretation of the District Act but it lends support to that interpretation. The National Act left the control over rent to local authorities, except where the National Price Administrator found it necessary to intervene. The decision of the National Price Administrator not to intervene in the District of Columbia was an especial compliment to the existing controls, because the District of Columbia was a typical area calling for competent rent control and, in fact, had been declared by the statute itself to be a "defense-rental area . . . ." § 302 (d); 56 Stat. 36, 50 U. S. C. App. (1946 ed.) § 942 (d). His satisfaction with the conditions in the District indicates that the local practice followed by the District Administrator of Rent Control, in not attempting to fix the rentals in Government-owned housing, had produced no conditions

---

[23] §§ 2 (b) and 302 (d), 56 Stat. 25–26, and 36, 58 Stat. 633–634, 59 Stat. 306–307, 50 U. S. C. App. (1946 ed.) § 902 (b).

which seemed to the National Price Administrator to call for federal intervention. A still more significant point is that, if he had intervened, under the National Act, he, and not the District Administrator of Rent Control, would have been the one vested with control over the rental policy of the Government-owned housing accommodations.

In contrast to the omission, in the District of Columbia Emergency Rent Act, of any express reference to the United States as a landlord, the National Act *expressly* included the United States as a "person" to whom it applied.[24] Thus, within two months after the omission of the United States from such a definition in the District of Columbia Emergency Rent Act, Congress demonstrated that, when it sought to include control of Government-owned housing under conditions where the established procedures and local controls might fail to meet the needs

---

[24] It was made unlawful for "any person" to violate the Act or regulation issued pursuant to the Act, § 4, 56 Stat. 28, 50 U. S. C. ᴅ. (1946 ed.) § 904, and then "person" was defined as follows: ʟᴇᴄ. 302. As used in this Act—

"(h) The term 'person' includes an individual, corporation, partnership, association, or any other organized group of persons, or legal successor or representative of any of the foregoing, and includes the United States or any agency thereof, or any other government, or any of its political subdivisions, or any agency of any of the foregoing: *Provided,* That no punishment provided by this Act shall apply to the United States, or to any such government, political subdivision, or agency." 56 Stat. 36–37, 50 U. S. C. App. (1946 ed.) § 942 (h).

The Act also provided:

"Sᴇᴄᴛɪᴏɴ 1. . . .

"(c) The provisions of this Act shall be applicable to the United States, its Territories and possessions, and the District of Columbia." 56 Stat. 23–24, 50 U. S. C. App. (1946 ed.) § 901 (c).

of the times, it expressly said so. The same section provided that the punishments prescribed for private violators did not apply to the United States.

The National Price Administrator, however, never published any regulations even potentially applicable to the District of Columbia. On the other hand, he did publish regulations stating his general policy as to Government-owned, housing accommodations elsewhere which might come under his control. Such regulations stated that, for housing constructed and owned by the United States, a state or any political subdivision of either, the maximum rents were to be those generally prevailing for comparable housing accommodations on the maximum rent date "as determined by the owner of such accommodations: . . . ." Similarly, for housing accommodations rented to Army or Navy personnel, including civilian employees of the War and Navy Departments, for which rent is fixed by the national rent schedule of the War or Navy Departments, the maximum rents were to be those established by such rent schedule.[25]

---

[25] "Sec. 4. *Maximum rents.* Maximum rents . . . shall be:

"(g) *Housing owned and constructed by the government.* For housing accommodations constructed by the United States or any agency thereof, or by a State of the United States or any of its political subdivisions, or any agency of the State or any of its political subdivisions, and owned by any of the foregoing, the rent generally prevailing in the Defense-Rental Area for comparable housing accommodations on the maximum rent date, as determined by the owner of such accommodations: *Provided, however,* That any corporation formed under the laws of a State shall not be considered an agency of the United States within the meaning of this paragraph. The Administrator may order a decrease in the maximum rent as provided in section 5 (c).

"(h) *Housing subject to rent schedule of War or Navy Department.* For housing accommodations rented to either Army or Navy personnel, including civilian employees of the War and Navy Depart-

Later, when Congress enacted the Housing and Rent Act of 1947, 61 Stat. 193–201, 50 U. S. C. App. (1946 ed., Supp. I) §§ 1881–1901, it expressly excluded the District of Columbia from the Act and struck out the previous express inclusion of the United States as a "person" subject to the Act.[26]

The effect of the National Emergency Price Control Act, therefore, is to emphasize, both in its form and its practical operation, that Congress did not seek by the District of Columbia Emergency Rent Act to place Government-owned housing under a local rent administrator.

---

ments, for which the rent is fixed by the national rent schedule of the War or Navy Department, the rents established by such rent schedule." 10 Fed. Reg. 13529–13530.

For the exception of housing accommodations rented to Army or Navy personnel, including civilian employees of the War and Navy Departments, from provisions restricting removal of tenants, see § 6 (c) (2), 10 Fed. Reg. 13534.

[26] The Housing and Rent Act of 1947, 61 Stat. 193, 197, superseded the National Emergency Price Control Act of 1942. It provided:

"SEC. 202. As used in this title [MAXIMUM RENTS]—

"(a) The term 'person' includes an individual, corporation, partnership, association, or any other organized group of persons, or a legal successor or representative of any of the foregoing." 61 Stat. 196, 50 U. S. C. App. (1946 ed., Supp. I) § 1892 (a).

"SEC. 209. . . .

"(b) Notwithstanding any other provision of this Act, the United States or any State or local public agency may maintain an action or proceeding to recover possession of any housing accommodations operated by it where such action or proceeding is authorized by the statute or regulations under which such accommodations are administered: . . . ." 61 Stat. 200–201, 50 U. S. C. App. (1946 ed., Supp. I) § 1899 (b).

"SEC. 211. The provisions of this title [MAXIMUM RENTS] shall be applicable to the several States and to the Territories and possessions of the United States but shall not be applicable to the District of Columbia." 61 Stat. 201, 50 U. S. C. App. (1946 ed., Supp. I) § 1901.

IV. *The District Administrator of Rent Control has not taken part in this proceeding and there is no evidence before us that at any time he has sought to exercise jurisdiction over the United States as a landlord of either low-rent housing or defense housing.*

The District of Columbia Emergency Rent Act has been in effect since 1941 and the United States as landlord has owned and operated several thousand housing units in the District. There is nothing in the Rules and Regulations or the General Orders of the Office of the Administrator of Rent Control suggesting the application of the Act to the United States as a landlord of Government-owned housing. The absence of evidence of asserted control by the District official, coupled with the absence of complaint by the National Price Administrator during the life of the National Emergency Price Control Act, is thoroughly consistent with a widely accepted interpretation of the local Act in accordance with the conclusion which we have found to be fully justified by the language of Congress.

The judgment accordingly is reversed and the cause is remanded to the Court of Appeals for the District of Columbia Circuit for further proceedings consistent with this opinion.

*It is so ordered.*