# Importation of Morphine Sulfate for Placement in the National Defense Stockpile

The Attorney General may authorize the General Services Administration to import morphine sulfate from Turkey for placement in the National Defense Stockpile under an exception in 21 U.S.C. § 952(a)(2)(A), if he determines that acquisition by import is necessary due to an emergency in which domestic supplies are inadequate to meet a legitimate need of the United States.

A reasonable argument can be made that the prohibition in 21 U.S.C. § 952(a) does not apply to the importation of drugs by the United States, notwithstanding long-standing and consistent administrative practice and interpretation to the contrary.

July 19, 1982

## MEMORANDUM OPINION FOR THE ACTING ADMINISTRATOR, DRUG ENFORCEMENT ADMINISTRATION

You asked whether the Attorney General[1] may, in light of 21 U.S.C. § 952(a), permit the General Services Administration (GSA) to import, for placement in the National Defense Stockpile, morphine sulfate manufactured in Turkey. Assuming that § 952(a) applies to the importation of drugs by the United States, although a reasonable legal argument can be made that it does not, we conclude that the Attorney General may nevertheless be in a position to sanction the import if the facts indicate that it would fall within an exception to the § 952(a) prohibition.[2]

Section 952(a) provides:

> It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of

---

[1] Your question is phrased in terms of the authority of the Attorney General. We note, however, that the Attorney General's authority under 21 U.S C. § 952(a) has been delegated to the Administrator of the Drug Enforcement Administration, 28 C.F.R. § 0 100, and has, in the past, been exercised by him. E.g., 39 Fed Reg 44033 (1974). For the purposes of consistency, both with the language of your request and with that of the statute, we will refer throughout our opinion to the authority of the Attorney General under § 952(a). It should be understood, however, that the Administrator of the Drug Enforcement Administration is the official who actually exercises that authority

[2] You asked also that we consider, if we conclude that § 952(a) prohibits the import, whether other, superior legal authority is available to authorize it We have researched this point and have found no statute which by its terms or by fair implication would authorize the President, the Attorney General, or any other Executive Branch official to permit an import otherwise prohibited by § 952(a) Nor do we know of a constitutional power of the Executive, applicable in present circumstances, to override a valid law enacted by Congress and made applicable to the United States.

455

subchapter I of this chapter or any narcotic drug in schedule III, IV, or V of subchapter I of this chapter, except that—

(1) such amounts of crude opium and coca leaves as the Attorney General finds to be necessary to provide for medical, scientific, or other legitimate purposes, and

(2) such amounts of any controlled substance in schedule I or II or any narcotic drug in schedule III, IV, or V that the Attorney General finds to be necessary to provide for the medical, scientific, or other legitimate needs of the United States—

(A) during an emergency in which domestic supplies of such substance or drug are found by the Attorney General to be inadequate, or

(B) in any case in which the Attorney General finds that competition among domestic manufacturers of the controlled substance is inadequate and will not be rendered adequate by the registration of additional manufacturers under section 823 of this title,

may be so imported under such regulations as the Attorney General shall prescribe. No crude opium may be so imported for the purpose of manufacturing heroin or smoking opium.

Morphine sulfate is a schedule II controlled substance within the meaning of § 952(a). 21 C.F.R. § 1308.12 (1981). It is not crude opium. Under the plain language of § 952(a) its importation into the United States is, therefore, unlawful unless one of the exceptions of subsection (2) applies. You have informed us that, in your view, competition among domestic manufacturers of morphine sulfate is adequate and that the exception contained in § 952(a)(2)(B) is, for this reason, unavailable on the facts. We accept this assessment and our opinion does not treat that exception. You observe also that "today, no shortage of morphine sulfate is known to exist." This observation calls into question the applicability of the exception provided for in § 952(a)(2)(A). We are reluctant, however, to conclude, on the basis of your observation—notwithstanding the recognized expertise of the Drug Enforcement Administration (DEA) concerning the normal needs of the country for morphine sulfate and the adequacy of domestic supplies to meet those needs—that the availability of a § 952(a)(2)(A) exception is necessarily foreclosed under the facts in the case at hand. Our reluctance stems from our belief that agency expertise in addition to that of DEA should appropriately be consulted to permit full factual development and to assist in making or rejecting the finding required by § 952(a)(2)(A).

As stated above, GSA wishes to import morphine sulfate from Turkey for placement in the National Defense Stockpile. Under the Strategic and Critical Materials Stock Piling Act, 50 U.S.C. §§ 98–98h–4 (Supp. III 1979), the President is charged with responsibility to "determine from time to time (1) which materials are strategic and critical materials for the purposes of [the

Act], and (2) the quality and quantity of each such material to be acquired for the purposes of [the Act] and the form in which each such material shall be acquired and stored." 50 U.S.C. § 98b(a). He is directed to acquire and store materials determined to be strategic and critical, 50 U.S.C. § 98e(a)(1) and (2), in the "interest of national defense," and in quantities "sufficient to sustain the United States for a period of not less than three years in the event of a national emergency." 50 U.S.C. § 98b(b)(1) and (2). The basic purpose which Congress intended the Act, and thus the authority of the President, to serve is "to decrease and to preclude, when possible, a dangerous and costly dependence by the United States upon foreign sources for supplies of [strategic and critical materials] in times of national emergency." 50 U.S.C. § 98a(b). It is clear that the acquisition and maintenance of adequate supplies of strategic and critical materials in the National Defense Stockpile is, under the Act, a high national priority and an important responsibility of the President.

The President has delegated to various officials his functions and authority, although not his ultimate responsibility, *see* 3 U.S.C. § 301, under the Strategic and Critical Materials Stock Piling Act. Executive Order No. 12155 of Sept. 10, 1979, 44 Fed. Reg. 53071, *reprinted in* 50 U.S.C. § 98 note (Supp. III 1979). Relevant here, he has authorized the Director of the Federal Emergency Management Agency (FEMA) to determine on his behalf which materials are to be designated strategic and critical and in what quantity, quality and form they are to be acquired for storage in the National Defense Stockpile. Executive Order No. 12155, § 1–101. In addition, he has delegated to the Administrator of General Services authority to acquire the designated materials. Executive Order No. 12155, § 1–102.

Pursuant to this delegation, the Director of FEMA has, we are informed, designated opium salts in the form of morphine sulfate as a strategic and critical material and has made it one of the highest priority items for acquisition for the National Defense Stockpile. At present, in spite of this high priority, the supply of opium salts, together with an equivalency in raw opium from which the salts may be processed, is 58,697 AMA (anhydrous morphine alkaloid) lbs., or approximately 45 percent, below the goal of 130,000 AMA lbs. which the Director of FEMA has set. The Administrator of General Services is attempting "to correct this critical shortage" and plans to acquire approximately 44,000 AMA lbs. of opium salts within one year. The Administration has determined that 20,000 AMA kilograms (approximately 44,000 AMA lbs.) of morphine sulfate, the form of opium salts which FEMA has specified as its first preference for storage in the National Defense Stockpile, can be acquired from the Turkish Soil Products Office within the established one-year time period.

We doubt that it can be disputed that the acquisition of morphine sulfate for the National Defense Stockpile is, within the terms of § 952(a), in furtherance of a legitimate need of the United States. The factual question remains, however, whether such acquisition by import from Turkey (as opposed to by purchase from U.S. manufacturers) is *necessary* due to an emergency in which domestic supplies of morphine sulfate are inadequate to meet this legitimate need. This is

the finding required by § 952(a)(2)(A). To answer this question, we believe it is essential first to identify precisely what that need is, second to determine whether failure to fulfill that need creates an emergency situation, and finally to examine whether domestic supplies are adequate to meet the need as identified, within the time period set by FEMA and GSA.

Since FEMA is the government agency with both the authority and primary responsibility under Executive Order No. 12155 to determine what the need is, and with the expertise to know whether failure to meet that need creates an emergency with respect to the defense preparedness of the United States, its views on these issues should be solicited and will be entitled to considerable weight. It is also apparent that GSA, which is charged with fulfilling the need, is in a position to have or to develop the facts concerning the adequacy and availability of domestic supplies to satisfy the need according to the terms set by the two agencies.

We cannot, of course, predict whether, after FEMA and GSA have been consulted and additional information made available to DEA from other sources has been considered, the facts will establish the availability of a § 952(a)(2)(A) exception for the importation from Turkey of morphine sulfate for the National Defense Stockpile. We cannot rule out the possibility, however, that an inquiry properly focused on the relevant facts would establish that § 952(a)(2)(A) is applicable to the proposed import. Such an inquiry should give due consideration to the requirements and views of FEMA and GSA, as well as to the facts presented by them and by other interested parties,[3] including: the need for the specific substance morphine sulfate in the National Defense Stockpile; the quantity and quality of morphine sulfate needed; the period of time within which that need must be met; the consequences to national defense preparedness if that need is not fulfilled within that time period; whether those consequences would constitute an emergency; and whether domestic supplies of morphine sulfate are, or will be, adequate during the relevant time period to meet that need, both as to quantity and quality, given that the medical, scientific, and other legitimate needs of the United States, including the maintenance by private industry of sufficient reserve supplies, for opium-based drugs must be met simultaneously.

As we noted earlier, a legal argument can be made that § 952(a) is inapplicable in the case of an import by the United States, through one of its agencies, of a controlled substance otherwise within the scope of this statute. This argument is based on a line of Supreme Court cases best typified by *United States* v. *United Mine Workers,* 330 U.S. 258 (1947), which hold that, as a matter of statutory construction, unless extraneous and affirmative reasons (such as the legislative history or the context within which a statutory scheme operates) indicate otherwise, "statutes which in general terms divest pre-existing rights or privileges will not be applied to the sovereign without express words to that effect." *Id.* at 272. *See also Hancock* v. *Train,* 426 U.S. 167 (1976); *United States* v. *Wittek,* 337 U.S. 346 (1949); *United States* v. *Herron,* 87 U.S. (20 Wall.) 251 (1874); *United*

---

[3] A formal hearing on the availability of a § 952(a)(2)(A) exception is not required. 21 U.S.C. § 958(h).

*States* v. *Knight,* 39 U.S. (14 Pet.) 301 (1840); and 26 Op. Att'y Gen. 415 (1907) (Statute prohibiting, on penalty of forfeiture, transportation of merchandise from one United States port to another in foreign-owned vessels inapplicable to the shipment of property owned by the United States).

Without going into detail, we observe that nothing specific in the language of § 952(a) or of its predecessor statute, the Narcotic Drugs Import and Export Act of 1922, Pub. L. No. 227, § 2(b), 67th Cong., 2d Sess., 42 Stat. 596, 21 U.S.C. § 173 (1964) and little in their combined legislative histories indicates clearly that they were intended to restrict the actions of the United States. Thus application to § 952(a) of the rule of construction that general statutes do not divest the sovereign of pre-existing rights is not clearly precluded. The argument that § 952(a) should not be construed to prohibit importation by the United States is strengthened when one considers the statutory mechanisms chosen by Congress to enforce it: criminal prosecution, 21 U.S.C. § 960, and forfeiture to the United States, 21 U.S.C. §§ 965, 880. Both penalties are inappropriate for application to the United States.

Other arguments, however, support the conclusion that the prohibition of § 952(a) should be applied to the United States. Primary among these is that DEA and its predecessor agencies responsible for enforcing § 952(a) and its progenitor have long interpreted the provisions as applicable to the United States, *e.g.,* 21 C.F.R. §§ 1311.24–25 (Exempting military personnel and certain federal law enforcement personnel from import and export registration requirements). The United States, as an administrative practice, has never imported narcotics in violation of these provisions. This interpretation by the agency responsible for administering the statute, and the long and consistent administrative practice, would, we believe, carry great weight with the courts. *E.g., United States* v. *Rutherford,* 442 U.S. 544, 553–54 (1979). Moreover, although direct evidence is scanty, there is some indication in the legislative history that § 952(a) is intended, at least in part, to foster a United States industry to produce opium-based drugs and to protect that industry from foreign competition. *See generally Controlled Dangerous Substances, Narcotics and Drug Control Laws: Hearings Before the House Committee on Ways and Means,* 91st Cong., 2d Sess., 458–62 (1970) (Statement of Stephen Ailes). *See also* 21 U.S.C. § 958(h) (Giving U.S. manufacturers certain hearing rights before imports may be authorized). Failure to apply the law to the United States, a substantial consumer of such drugs, arguably would be inconsistent with such an intent. Further, § 952(a), like its predecessor, places an absolute ban on the importation of opium for manufacturing heroin or smoking opium. Since this prohibition was derived from § 952(a)'s predecessor and since that statute was enacted in large part in reaction to adverse congressional and public opinion concerning the increase in drug use in the United States for non-medical purposes—particularly opium smoking—it seems doubtful that Congress meant to exempt the United States

from this particular prohibition. Finally, § 952(a) must be read in *pari materia* with 21 U.S.C. § 953(a)[4], dealing with the export of controlled substances. We note that the prohibitions of that section almost certainly are applicable to exports by the United States since they are intended to implement the treaties and international conventions cited in that section and those treaties and conventions apply, by their terms, to actions of the United States government.

In conclusion, an argument can be made, as outlined briefly above, that § 952(a) does not bind the United States. Nevertheless, a contrary legal argument can be made, based on administrative practice and interpretation, that it does. In these circumstances, we conclude that it would be imprudent to rely solely on this argument to attempt to justify the proposed import by GSA of morphine sulfate from Turkey without first carefully examining the relevant facts available to FEMA and GSA to determine whether the § 952(a)(2)(A) exception is available. Should you determine that the facts do not support an exception under that section, we would be pleased to explore more fully the legal question of the applicability of § 952(a) to imports of controlled substances by the United States.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[4] Both are sections of the Controlled Substances Import and Export Act, which was enacted as Title III of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub L No 91–513, Title III, 91st Cong , 2d Sess., 84 Stat. 1285.