27 N.J. Super. 328 (1953)
99 A.2d 377
THE PORT OF NEW YORK AUTHORITY AND WALSH CONSTRUCTION COMPANY, A CORPORATION, PLAINTIFFS,
v.
TOWNSHIP OF WEEHAWKEN, CHARLES F. KRAUSE, JR., MAYOR OF THE TOWNSHIP OF WEEHAWKEN, MARK T. AIELLO, W. LEO BATTEN, MATTHEW W. BEGOVICH, JAMES F. MAHER, JR., CHARLES J. PIZZUTA AND EARL M. PURDY, MEMBERS OF THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF WEEHAWKEN, NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided August 31, 1953.
*330 Mr. Russell E. Watson, attorney for plaintiffs (Messrs. Sidney Goldstein, Daniel B. Goldberg, Joseph Lesser, and Frank Moss on the brief)
Mr. James Rosen, attorney for defendants (Mr. Isadore Glauberman of counsel).
DREWEN, J.C.C. (temporarily assigned).
The plaintiff Port of New York Authority (herein called The Port Authority) is a body corporate and politic existing by virtue of the compact between the States of New York and New Jersey, entered into April 30, 1921 (R.S. 32:1-7, art. VI), as the same is confirmed and validated by concurrent legislation of the two states (Laws of New Jersey, 1922, c. 9; Laws of New York, 1922, c. 43), and finally approved by Public Resolution No. 66 of the Sixty-seventh Congress of the United States (42 Stat. 822). The Port Authority was created in the character of "an instrumentality or agency of the two states to effectuate * * * a plan or plans for the comprehensive development of the" district or area within the territorial limits defined and designated as the Port of New York (R.S. 32:1-25). A comprehensive plan within the meaning and intent of the compact having previously been submitted to and adopted by the states, the latter did by appropriate legislation authorize and empower The Port Authority to effectuate the same, e.g., R.S. 32:1-33. Among the statutes concurrently enacted by the states from time to time, and vesting in the said plaintiff particular *331 power and authority for the successive projects undertaken by it within the plan aforementioned, are those pursuant to which the said plaintiff has heretofore constructed the two vehicular tubes or tunnels under the Hudson River, originally called the Midtown Hudson Tunnel and now known as the Lincoln Tunnel. These statutes read in part as follows (L. 1931, c. 4, sec. 2, p. 19; R.S. 32:1-119):
"In furtherance of the aforesaid policy, and in partial effectuation of the comprehensive plan heretofore adopted by the two said states for the development of the said the Port of New York District * * * the port authority is hereby authorized and empowered to construct, own, maintain and operate an interstate vehicular tunnel or tunnels (hereinafter called the Midtown Hudson tunnel) under the Hudson river, together with such approaches thereto and connections with highways as the port authority may deem necessary or desirable * * *."
The construction of the first tube of the Midtown Hudson Tunnel was begun in 1934 and completed in 1937. The construction of the second tube was begun in 1937 and completed in 1943. In order to expand the capacity of the Midtown Hudson Tunnel to an extent made exigent by subsequent traffic increase, as The Port Authority contends, it has projected the construction of the third tube, here in question, and to that end has made contracts for the work required. One of its contractors is the plaintiff Walsh Construction Company, which has contracted to build a ventilating shaft at the New Jersey end of the new third tube, the situs of the work being within the territorial limits of the defendant township. When the Walsh Company undertook to begin operations its servants and agents were confronted by the opposition of the township officials. The mayor and the authorities of the local police presented themselves to the company's representatives on the ground and ordered that the work be halted, declaring that it would be permitted only upon condition that The Port Authority or its contractor first comply with the township ordinances having reference to prerequisite municipal permits for operations of the kind in question. It should be noted that while the work was to be performed within the township limits, it was not upon township *332 property. There was no compliance with the township's demand as stated, and because of the situation thus created the company made no further attempt to proceed with its work. Plaintiffs thereupon filed their complaint and proofs in this court, and after preliminary hearing on the question of interlocutory restraint, such restraint was ordered. Final hearing has since been had and the cause fully argued. The question of permanent injunction is now to be decided.
The initial opposition by defendants, already described, was manifestly a challenge to the sovereignty represented by The Port Authority as an instrumentality of the states, and implicit in the opposition was the contention that The Port Authority was in no way absolved from compliance with the township ordinances having relation to the case. That position apparently has been abandoned, for it has not been urged upon the court and no such issue is stated in the pretrial order. The legal questions that would arise from it, however, would appear to be finally settled, and in plaintiffs' favor. See New Jersey Interstate Bridge and Tunnel Commission v. City of Jersey City, 93 N.J. Eq. 550 (Ch. 1922). In addition, plaintiffs' brief presents formidable precedents and compulsive argument to establish (a) that The Port Authority is charged with the performance of a governmental function, and that it and its agents and representatives are therefore within the rule that prevents a municipality from restricting the power of the State, its officers or agents, without express statutory language conferring such power upon the municipality; (b) that municipal building ordinances, among other things, are inapplicable to projects of the State or its agencies, unless the projects are made expressly subject to such ordinances by legislation of the State; and (c) that The Port Authority, being an agency of the two states and engaged in the effectuation of a compact between them, is immune from unilateral regulation by a municipality of one of the states.
The decisions that expressly accord to The Port Authority the characteristics of sovereign immunity from suit, and *333 those that affirmatively recognize it as an arm and agency of the states, include Port of New York Authority v. City of Newark, 17 N.J. Super. 328, 331 (Ch. Div. 1952); Miller v. Port of New York Authority, 18 N.J. Misc. 601, 606 (Sup. Ct. 1939); Howell v. Port of New York Authority, 34 F. Supp. 797, 800 (D.C.N.J. 1940); Port of New York Authority v. Union City, 19 N.J. Misc. 421 (Sup. Ct. 1941); Bush Terminal Co. v. City of New York, 282 N.Y. 306, 26 N.E.2d 269 (Ct. App. 1940); Graves v. New York ex rel. O'Keefe, 306 U.S. 466, 484, 59 S.Ct. 595, 83 L.Ed. 927 (1939); Commissioner of Internal Revenue v. Shamberg's Estate, 144 F.2d 998 (2 Cir., 1944), certiorari denied 323 U.S. 792, 65 S.Ct. 433, 89 L.Ed. 631 (1944); Sullivan v. Port of New York Authority, 134 N.J.L. 124 (Sup. Ct. 1946); Miller v. Port of New York Authority, 18 N.J. Misc. 601 (Sup. Ct. 1939).
The decisions that pronounce the claimed immunity from municipal ordinances and other local regulations include Trustees of Public Schools v. Taylor, 30 N.J. Eq. 618 (Ch. 1879), affirmed sub nom. Trustees of Public Schools v. City of Trenton, 30 N.J. Eq. 667 (E. & A. 1879); Interstate Bridge and Tunnel Commission v. City of Jersey City, supra, at p. 553; Denton v. State of N.Y., 72 App. Div. 248, 251-253, 76 N.Y.S. 167 (N.Y. 1902); Jewish Hospital of Brooklyn v. Doe, 252 App. Div. 581, 584, 300 N.Y.S. 111 (N.Y. 1937); United States v. Stevenson, 215 U.S. 190, 197, 30 S.Ct. 35, 54 L.Ed. 153 (1909); United States v. Wittek, 337 U.S. 346, 359, 69 S.Ct. 1108, 93 L.Ed. 1406 (1949); United States v. United Mine Workers, 330 U.S. 258, 272, 67 S.Ct. 677, 91 L.Ed. 884 (1947); Kentucky Institution for Education of the Blind v. City of Louisville, 123 Ky. 767, 97 S.W. 402, 8 L.R.A., N.S., 553 (Ky. Ct. App. 1906); City of Milwaukee v. McGregor, 140 Wis. 35, 121 N.W. 642 (Wis. Sup. Ct. 1909); City of Atlanta v. State, 181 Ga. 346, 182 S.E. 184 (Ga. Sup. Ct. 1935); Kubach Co. v. McGuire, 199 Cal. 215, 248 P. 676 (Cal. Sup. Ct. 1926); Board of Education of City of St. Louis v. City of St. Louis, 267 Mo. 356, 184 S.W. 975 *334 (Mo. Sup. Ct. 1916); Salt Lake City v. Board of Education, 52 Utah 540, 175 P. 654 (Utah Sup. Ct. 1918).
The doctrine that no political subdivision of either of the states bound by the compact has power to impede the performance of the obligation thus mutually undertaken is, of course, implicit in the very nature of the compact itself, not to mention also the holdings in the cited cases, specifically and by necessary implication.
On the basis of the argument made and of the authorities presented, the court would be obliged, without more, to grant the permanent restraint for which the plaintiffs ask. But the defense here is a concretely drastic challenge to the right of The Port Authority under the law of its existence to carry through what it has undertaken in the proposed third tube construction. The defendants' position is that, conceding the principles by which The Port Authority is for certain purposes to be identified with the states creating it, nevertheless it is not a law unto itself, that for the preservation of the very compact The Port Authority must be subordinated to the terms and conditions upon which it was brought into being and under which alone it can lawfully continue to exist and function. Upon this premise the charge is now made that the project here disputed is entirely illegal, for the reason that in definite respects it is a direct violation of the compact and the related statutes as well. So, the nature of the controversy being what it is, I am persuaded that a determination on broad grounds alone would be less than satisfactory, in a civic sense at any rate, and that it becomes incumbent upon the Court to deal with the matters in difference meritoriously and at length.
Admittedly the construction of the third tube has been undertaken without express authorization of the states or either of them, in addition to the authorization for the construction of the Midtown Tunnel as originally given. Defendants contend that additional express authorization is indispensable, and that in the absence thereof the project is without the sanction of law. Section 2 of the 1931 statutes (R.S. 32:1-119, supra), immediately following the quoted *335 authorization to construct the Midtown Tunnel, contains the following independent paragraph:
"The port authority shall from time to time make studies, surveys and investigations to determine the necessity and practicability of additional vehicular bridges and tunnels over or under interstate waters within the said Port of New York District, and report to the governors and legislatures of the two states thereon. The port authority shall not proceed with the construction of any additional vehicular bridges and tunnels over or under said interstate waters until hereafter expressly authorized by the two said states."
Defendants contend that the third tube is "additional" and hence subject to the restrictive force of the last sentence quoted.
The authorization to construct the Midtown Tunnel, in the section from which the quoted paragraph is taken, bears direct relation to concurrent enactments of the previous year, that of New Jersey being Laws of 1930, chapter 248. The import of this legislation was to authorize and direct the Port Authority
"to report to the Legislatures of the states of New York and New Jersey at the next sessions thereof, upon a tunnel or tunnels for vehicular traffic under the Hudson River, between a point or points in the vicinity of Thirty-eighth street, west of Ninth avenue in the borough of Manhattan, city of New York, and a point or points west of the Palisades in the state of New Jersey, such tunnel or tunnels to have entrances and exists [exits] on the east side of said Palisades, in the township of Weehawken, county of Hudson, * * *."
It was after a report pursuant to these 1930 enactments had been submitted to the Legislatures that the authorizing statutes of 1931, supra, were enacted.
The dominant question is whether the third tube is "additional" within the meaning of the 1931 statutes, as defendants contend. The answer calls for an interpretation of the pertinent language of the acts, as well as for a factual finding of the functional relation the third tube will bear, when constructed in accordance with the plan therefor, to the Lincoln Tunnel as it now exists. First as to the interpretation. The only construction authorized by the 1931 *336 acts, in their entirety, is that of the Midtown Hudson Tunnel. No bridge erection is mentioned and none is within the acts' contemplation or purpose. The force of the term "additional" as applied to a tube or tunnel is to be measured, therefore, by the natural and reasonable meaning that the same term must have when applied to a bridge. The categories are indiscriminately joined: "The port authority shall not proceed with the construction of any additional vehicular bridges and tunnels over or under said interstate waters * * *." Considering first, then, that the only new construction authorized is that of the Midtown Tunnel, and that no bridge is mentioned or referred to in the disputed context, save only such as The Port Authority had previously completed, the term "additional" as applied to vehicular bridges must be given its most unrestricted meaning, that is it must mean a new or another bridge, not new in any adjunctive sense merely but separately and independently new; from which it follows also that this meaning can be in no way diminished when applied, as the statute applies it in the same immediate context, to vehicular tunnels. It is simply impossible, in my judgment, objectively and reasonably to contemplate the adding of a third tube to the Midtown Tunnel as the construction of a new or another tunnel, in the only sense that the frame of the statute will permit. What the unlimited plural form does here, in my opinion, is to leave it to The Port Authority to determine how many tubes or tunnels the vehicular thoroughfare shall contain, guided by its own sound appraisal of advantage or necessity, with, of course, all current and future matter bearing on the subject to be submitted to the Legislatures in the annual reports that are hereinafter dealt with. In this regard the statute does no more than enlarge the discretion that it expressly allows in the same section (R.S. 32:1-119) respecting the approaches to the tunnel and connections with highways.
Secondly, and by way of what I deem to be a perfectly relevant illustration, it is manifest in my view that there is nothing in the statute to permit the conclusion that a project *337 for the widening or other increase of bridge capacity, to accommodate exigent growth in traffic pressure upon a bridge facility already created, would be a project for an "additional" bridge and therefore prohibited unless "expressly authorized by the two said states." In each instance of a statutory grant the authority given is for the "partial effectuation of the comprehensive plan," consonant, as that must be, with all the basic purposes of the plan. And the power and authority given by the 1931 acts is not only to construct the Midtown Hudson Tunnel, but also to "own, maintain and operate the same." It is at best gravely doubtful, I think, that an installation can be said to be "maintained and operated" in any realistic sense, especially when the responsibility is a concomitant of ownership, in the absence of adequate means and measures for preventing the progressive obsolescence of the installation that must result from an everwidening disparity between its capacity and its purpose. And when we consider that the problem is one of tubular traffic, it becomes clear that a sufficient degree of such disparity can work the severest impairment of use. I am not now referring to the relieving of a situation by separate and independent projects, but to what I believe the instant project to be, that is a measure ancillary to the existing project as originally planned and carried out.
Next, what is to be the relation between the third tube and the Lincoln Tunnel as it exists? Is the third tube to be in any sense a separate, independent thing? Can it, within the meaning of the statutes and in view of the proof submitted, be reasonably regarded as an "additional vehicular tunnel"? I am convinced that it cannot; that as between the existing tubes and the third tube the result of what plaintiffs seek to do will be an organic unification of all three tubes into a single facility, that is into a single Lincoln Tunnel; and that the third tube will, moreover, be normally incapable of service apart from its systemic integration with the others. Plaintiffs' expert engineering testimony is not contradicted on this score, save only in the partial and ineffectual way to be later noted. The third *338 tube will be located within the territorial limits fixed by the 1931 acts, it will utilize the same approaches, the same entrance and exit plazas, the same toll booths and a common center in a single administration building. According to the plan, two tubes will be used for traffic moving in one direction and one tube for traffic in the opposite direction; or one of the outer tubes plus one lane of the center tube for traffic in one direction, and the other outer tube and the remaining lane of the center tube for traffic in the opposite direction. There will thus be added to the existing facility of the Lincoln Tunnel an available functional area for the achievement of what is termed flexibility of traffic flow and the elimination of congestion and delay presently resulting from inadequate capacity. The third tube will be located southward of the present tunnel and its entrance and exit plazas will be so constructed that the third tube will be operable for only eastbound traffic, while the outer tube to the north will accommodate only westbound traffic. The third tube will, in a word, be usable exclusively for one way traffic, eastbound, a limitation that will deprive it of usefulness apart from the vehicular system of which it will be an added member. I take it from the proofs that the reduction of traffic pressure thus resulting will be a so-called "peak hour" relief, though that detail is not material to the decision.
Certain testimony of defendants' engineering expert was elicited to contravene the theory of inseparable utility in the third tube, but the only expert declaration made for defendants on this score relates the independent usefulness of the third tube entirely to imperatives of public calamity. One of the things specifically hypothesized by the expert was the possible emergency use of the third tube in the event of the destruction of the other tubes by "bombing."
Assuming, without adjudging it to be the case, that the plaintiffs are obliged to show that the construction in view is warranted or demanded by a more or less exigent necessity, I deem such showing to have been amply made. This is not the place for the marshalling of statistical figures. Such *339 data are stated and expounded at length in the testimony, but it can be said that the traffic pressure at the points affected by the matters here relevant is shown to have increased in a relatively short period with geometric progression. At least one consequence of the condition thus ensuing is the backing up of traffic for important distances during what the witnesses speak of as the "peak hours," on the approaching highways on the New Jersey side. But the more exigent consequences would appear to be the accumulation of blocked traffic in the streets of New York within the area embracing and adjoining the tunnel approaches. One incidental public danger that comes readily to mind is that which would be inherent in the barring of passage to fire apparatus.
Another point of objection is that The Port Authority's report to the state legislatures, made pursuant to the enactments of 1930, supra, embraces a plan for a vehicular tunnel designed to consist of two tubes; and the contention is that the scope of the project became legally restricted accordingly. True, the reported plan made pursuant to the 1930 enactments did envisage the building of a vehicular thoroughfare under the river that was to consist of two tunnels. But defendants' argument that this resulted in a fixed and permanent commitment by The Port Authority, or in a legal limitation of the project, to the construction of two tunnels and no more, is completely answered by the authorization acts of 1931, for if there was a delimitation as defendants contend, it follows that the legislatures unequivocally rejected it by providing, with simple amplitude, that the project to be known as the Midtown Tunnel was to consist of a "tunnel or tunnels," without suggestion of a limited number. The more binding The Port Authority's two-tube proposal is shown to be, the more emphatic its rejection must become.
It is a further contention of defendants that with the completion in February 1945 of the second of the two tunnels, the power conferred therefor became exhausted. It is my judgment that this argument is groundless and arbitrary. Not only did the authorization acts impose no *340 restriction upon the number of tubes to be built in the tunnel, but there is no time limit set for completion. The only way a time limit could be established now would be by fiat retroactive pronouncement. As already shown, eight years elapsed between the completion of the first and the completion of the second tube, and it is eight years now since the latter completion that the third tube is in project. The argument can have no force in the absence of a legislative restriction to two tunnels, for its sole premise is the assumption, in my view groundless, that such a restriction obtains. I judge the authorization acts of 1931 to be perfectly clear and in no way ambiguous. In any event, courts do not take guidance from extrinsic data in the interpretation of statutes, and certainly not in a situation so devoid of difficulty as I judge this one to be. Reliance for interpretive purpose on the extrinsic data of The Port Authority reports to the legislatures made in accordance with the 1930 statutes is not to be countenanced. Base v. Allen Home Improvement Company, 8 N.J. 219, 226 (1951); Board of National Missions of Presbyterian Church in the United States v. Neeld, 9 N.J. 349, 356 (1952); Jersey Central Power & Light Co. v. State Board of Tax Appeals, 131 N.J.L. 565, 568 (E. & A. 1944); Flagg v. Johansen, 124 N.J.L. 456, 459-460 (Sup. Ct. 1940).
With further reference to defendants' contention for the principle of exhausted power, let it be noted that the doctrine was denied application by the United States Supreme Court in Newark v. Central Railroad of N.J., 267 U.S. 377, 45 S.Ct. 328, 69 L.Ed. 666 (1925), the case originating in our own State. And for a like rejection upon closely comparable facts, in another jurisdiction, see Chamberlain v. Board of Commissioners, 243 Ala. 662, 11 So.2d 724 (Ala. Sup. Ct. 1943).
Defendant urges it as unthinkable "that the Court should override the plain legislative mandate and confer upon The Port Authority the power, twenty years after a construction has been authorized, to construct a new tunnel." The "plain legislative mandate" has already been dealt with, but what *341 must be remembered is that of the joint sovereignty of the two states The Port Authority is but the performing agent, designed to effectuate particular objects within the sphere of a comprehensive plan. The agency, the objects and the plan are those of the states, and whatever implementations of power, authority, operation and ownership have been or may be resorted to for equipping the agent with the faculties of readier and more convenient accomplishment, they are but implementations nonetheless. Moreover, in their creation of such devices the states yield not a whit of their sovereign control of the agent, either for its restraint to the utmost, or for its utter extinction and the substitution of other means to the ends in view. The Port Authority has no latitude in the execution of its purpose save that which the states have given it. The states' system of surveillance and control is what the states have ordained it should be, and the outstanding feature of the system is the making of annual reports "to the legislature of both states setting forth, in detail, the operations and transactions conducted by it [The Port Authority] pursuant to this agreement and any legislation thereunder." (Compact, art. VII; R.S. 32:1-8). The annual reports are in evidence for the years 1950, 1951, 1952. Each is a stout book that propounds in graphic and voluminous detail information upon the project of building the under-river tube that is now in question. Defendants argue that these reports are of no creative legal substance; that the mere giving of knowledge to legislative bodies, and no matter what the tacit assent may be, can result in no substitute for affirmative enactment. The truth of this is not in conflict with the present situation, nor with the function that is performed in it by the legislatures' system of surveillance as the legislatures very obviously understand it. The court's task in this particular is unique, in that the inquiry is for the meaning and intent that underlies a statutory system of official dealing which the statute-making authority has itself been continuously and uniformly operating. The direct question arises: Is it the intent of the power that ordained and now operates the system that the *342 plan and prosecution of the work here in question shall be deemed to derive sanction from the original authorization plus compliance with the annual report provision of the statutes; or that it can have no sanction without additional express statutory authorization? If the legislators' conduct of their own affairs in this particular is the paramount criterion, and rationally it can be no less, there is but one answer to the question. It so happens that The Port Authority has already initiated and carried to conclusion a number of extensive projects, auxiliary and adjunctive to prior existing major installations, and between which and the project here in question the difference is one of extent or degree only. These projects are shown to be: (1) the connection of the Lincoln Tunnel to the new New Jersey Turnpike ($3,898,000); (2) "extensive and continuous additional connections" from time to time on both sides of the George Washington Bridge ($17,668,000); (3) the new westbound viaduct from the Holland Tunnel at the New Jersey end ($3,200,000). From first to last these undertakings were reported just as the present one has been, and all were treated by both legislatures, without additional statutory sanction, as equally within their respective original authorizations. For an additional support of its claim of right The Port Authority invokes the doctrine of contemporaneous administrative construction. Notwithstanding the terminology that has been applied to the works above set forth, I see no reason why they, together with the work in question, might not just as well be called simply "additions and improvements" within the meaning of section 4 of the 1931 enactments (R.S. 32:1-121); and the principle of contemporaneous administrative construction is, in my opinion, expressly indicated in section 15 of the same enactments (R.S. 32:1-132). These provide for the acquisition of real property to be used, inter alia, in the making of "additions or improvements to bridges or tunnels already constructed," and, further, that the power to acquire such property "shall be a continuing power, and no exercise thereof shall be deemed to exhaust it."
*343 It is in order to state, by way of summary, that the legislatures' conduct of their aforementioned business respecting the other projects named, is no less illuminative of the extent of the authority conferred by the authorization acts, including the act under review, than it is of the efficacy of the annual reports. The reports are complementary of the statutes, and the evidence inherent in the legislatures' conduct embraces both. The enactments confer the power, the reports tell the plans for its use.
The cost of the projected third tube is so impressive, considered apart from the situation as a whole, that upon the argument defendant appeared to stress it as something of a determining factor in itself. Whatever relevancy this feature might have in a legislative controversy on the general subject, I am sure it has none here. If the third tube in the situation presented is not an "additional tunnel" within the intendment of the 1931 statutes, The Port Authority is free to proceed without separate express legislative authority, otherwise not; and as between one such auxiliary project and another the statutes make no quantitative distinction. At the hazard of irrelevancy it can also be observed that the system of financing which permeates the whole Port Authority law would hinder rather than help the force of any contention that could be made under this head. The basic aim of the system is that the facilities created shall be or become self-sustaining. Certain provisions in particular are pertinent. Article VII of the compact provides "the port authority shall not pledge the credit of either state except by and with the authority of the legislature thereof." The statutes do not disclose that such authority has ever been given, and in the present instance there is nothing to show that it is required or asked. R.S. 32:1-8. Under the restrictions of Article VI of the compact The Port Authority may borrow money for its purpose only on the security of "any property held or to be held by it," (R.S. 32:1-7); and as each particular project has been authorized plaintiff was given the power to pledge the revenues thereof (R.S. 32:1-51, 32:1-62, 32:1-74, 32:1-86). Such advances as *344 the states have made from time to time have been for specific use upon particular projects, and to be repaid in every instance upon the statutory terms imposed with the grant. E.g., R.S. 32:1-45, 32:1-57. The repayments are to cover interest as well as amortization. R.S. 32:1-63. See also R.S. 32:1-81; 32:1-110. The financing of the present project in accordance with the principles stated is further indicated in R.S. 32:1-121 to 126, et seq.
Defendants would also bring to bear upon the question the provisions of Article XI of the compact (R.S. 32:1-12), relating to changes in the comprehensive plan. The argument stresses the requirements of the article that supplemental or amendatory plans shall be binding upon both states and duly approved by the legislatures. What Article XI deals with is plans "supplementary to or amendatory of any plan heretofore adopted," that is, it deals with later changes in the original comprehensive plan for the development of the whole port area. It has no relation whatever to a particular project already authorized and completed, for the "partial effectuation" of the comprehensive plan.
The pretrial order contains the statement of a further issue, arising from the charge that The Port Authority is "unlawfully proceeding with the work of constructing the third tube without municipal consent to the use or taking of municipally owned property therefor, and without the approval of plans for the proposed third tube by the Township Committee."
I think the issue thus presented requires but little attention. Plaintiffs' suit is to restrain defendant permanently from preventing or impeding the work of its contractor Walsh Construction Company on the third tube ventilation shaft, and defendants do not contend that the stated operation involves the taking of municipally-owned property. But viewing things in their entirety, it is still a perfectly sound conclusion, in my opinion, that while unquestionably municipal consent is required for the taking of municipal property, that consent is not a prerequisite to the beginning of work on the project, assuredly so where there has been no actual or *345 attempted use or occupation of municipal property. The plaintiff Port Authority has been and presumably still is in negotiation with the representatives of the township for the composing of whatever differences there may be between them in this regard. Any other or further consent or approval that the township may insist upon respecting plans as stated in the pretrial order, has no sanction in any provision of the compact or the concurrent statutes.
For the reasons set forth it is my judgment that the plaintiffs are entitled to the permanent restraint for which they ask.