THE PORT OF NEW YORK AUTHORITY AND WALSH CON-
STRUCTION COMPANY, PLAINTIFFS-RESPONDENTS, v.
TOWNSHIP OF WEEHAWKEN, CHARLES F. KRAUSE,
JR., MAYOR OF THE TOWNSHIP OF WEEHAWKEN,
*ET AL.*, DEFENDANTS-APPELLANTS.

Argued March 1, 1954—Decided March 15, 1954.

Mr. *James Rosen* argued the cause for appellants (*Mr. Isadore Glauberman*, of counsel).

Mr. *Russell E. Watson* argued the cause for respondents (*Messrs. Sidney Goldstein, Daniel B. Goldberg, Joseph Lesser, Frank Moss* and *Jack Rosen*, of counsel).

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J.    The Port of New York Authority has commenced the construction, estimated to cost $90,000,000, of a third tunnel of the Lincoln Tunnel, originally named the Midtown Hudson Tunnel, without having first obtained express authorization for such construction from the Legislatures of New York and New Jersey under section 2 of chapter 4 of the 1931 Laws of New Jersey which in pertinent part provides:

"* * * and the Port Authority is hereby authorized and empowered to construct, own, maintain and operate an interstate vehicular tunnel or tunnels (hereinafter called the Midtown Hudson Tunnel) under the Hudson River, together with such approaches thereto and connections with highways as the Port Authority may deem necessary or desirable.

"The Port Authority shall from time to time make studies, surveys and investigations to determine the necessity and practicability of additional vehicular bridges and tunnels over or under interstate waters within the said Port of New York district, and report to the Governors and Legislatures of the two States thereon. The Port Authority shall not proceed with the construction of any additional vehicular bridges and tunnels over or under said interstate waters until hereafter expressly authorized by the two said States."

The case is here on certification of our own motion of the appeal of the Township of Weehawken to the Appellate Division from a judgment of the Chancery Division restraining the township from interfering with the operations of a contractor engaged by the Port Authority to do certain of the tunnel work to be performed in the township. The Chancery Division found no merit in the township's contention that the Port Authority has no authority to construct the third tunnel without the express permission of the Legislatures of the two States. *The Port of New York Authority v. Township of Weehawken*, 27 *N. J. Super.* 328 (1953).

We reach a conclusion contrary to that of the Chancery Division. In our view the provision that the Port Authority shall not proceed with the construction of "any additional" tunnel until expressly authorized by the two States applies with perfect directness to the construction of the third tunnel and without such authorization the Port Authority may not lawfully proceed with its construction.

The Lincoln Tunnel is a vehicular crossing under the Hudson River between Weehawken in New Jersey and midtown New York City. It consists of two tunnels, the first completed in 1937 and the second in 1945. Originally estimated to cost $96,000,000, the twin tunnels actually cost $87,000,000. The Lincoln Tunnel is one of three major trans-Hudson River vehicular crossings operated by the Port Authority. The others are the Holland Tunnel between Jersey City and downtown New York City, and the George Washington Bridge between Fort Lee, New Jersey, and the Bronx, uptown New York City.

The plan is that the two existing tunnels and the proposed third tunnel of the Lincoln Tunnel will be a single integrated facility. The 1950 Annual Report of the Port Authority to the Governors and Legislatures of the two States, filed in compliance with *R. S.* 32:1–8, informs us that "The two lane third tube, when completed, will be operated in an eastbound direction, and the north tube westbound; the middle or present south tube will carry traffic eastbound in the morning and westbound in the evening, or may operate one lane in each direction. This permits the use of four lanes in the peak direction with two lanes in the opposite direction."

The third tunnel is not projected merely to improve the service at the Lincoln Tunnel crossing. In a substantial way it is tantamount to if not actually a substitute for a new trans-Hudson River crossing. It is designed specifically to relieve in a measurable degree the acute trans-Hudson River vehicular traffic problem which has worsened annually in alarming proportions since the end of World War II.

The Port Authority operates upon principles embodied, upon its recommendations, in the 1931 statute. Fundamentally those principles reflect the concept that maximum advantage of the commercial and industrial potential of the Port district is to be realized from a coordinated and carefully planned attack upon the entire Port district vehicular transportation problem through provision of an integrated and self-supporting system of interstate crossings financed through the pooling of the revenues from all units and constructed and operated by a single agency for maximum efficiency and economy. There is common agreement that, under Port Authority administration, the policy has proved highly beneficial to the welfare and economy of the Port district.

The 1931 plans for the Lincoln Tunnel forecast that it would "approach its capacity traffic volume in 1946" and that the "total trans-Hudson traffic in 1948 will be 75,000,-000 vehicles." The Port Authority's 1952 Annual Report shows that actually 73,344,791 vehicles used "the Port Au-

thority's six crossings in 1952" and remarks the "heavy uptrend so persistent since World War II." Also noted was the shift of "trans-Hudson traffic northward to the George Washington Bridge and Lincoln Tunnel and away from the Holland Tunnel," a result of the "opening of the New Jersey Turnpike." The Bridge traffic was up 18.8% over 1951 and Lincoln Tunnel traffic up 12.1%. Holland Tunnel traffic showed a decline of 4.3%, and the Staten Island crossing also registered a slight decline. It was in this setting that the third tunnel was projected in 1950 as a "great contribution toward unravelling the interstate traffic snarl in the Port District." Certainly, more than a mere adjunct, a simple addition or improvement, to the existing crossing is in view. "Upon its completion, scheduled for 1957," continues the Annual Report, "The third tube will double the peak-hour capacity of the Lincoln Tunnel in one direction and will boost the Tunnel's annual capacity by an estimated 10,000,000 vehicles," which "will increase its annual capacity by 50 per cent."

The 1950 Annual Report contains a comment which openly suggests that it was necessary to project the third tunnel as the alternative to a new crossing at another location. The comment is, "This facility, to be completed in 1957, is expected to be self-supporting, an important factor when it is realized that a new two tube tunnel, probably costing over $200,000,000, could not in the foreseeable future pay for itself." At all events, the Port Authority Commissioners on May 16, 1950 appropriated $120,000 for an immediate engineering study of a new two-lane tube at the Lincoln Tunnel "to augment the two existing tubes so that the increasing load of trans-Hudson traffic might be more effectively handled." And the resolution of the Port Authority Commissioners, adopted March 8, 1951, authorizing the construction of the third tunnel recites that the "Port Authority has heretofore constructed two such interstate tunnels (which two tunnels are known collectively as the Lincoln Tunnel) and it is desirable and in the public interest to construct a third such tunnel under and pursuant to such statutes and

agreements at the location specified therein, to relieve traffic at said two existing tubes of the Lincoln Tunnel and at other crossings of the Hudson River  *   *   *."

The Port of New York Authority was created in 1921 by the States of New York and New Jersey, with approval of the Congress, as a joint or common agency of the two States, 1921 *New York Laws, chapter* 154, 1921 *New Jersey Laws, chapter* 151, *R. S.* 32:1–1 *et seq.; Public Res. No.* 17, *67th Cong., S. J. Res.* 88, 42 *Stat.* 174. The Congressional resolution forbids the building of bridges, "tunnels" or other structures across or under any of the waters under Port Authority cognizance "until the plans therefor have been approved by the Chief of Engineers and the Secretary of War." The Port Authority acknowledged that the Army's approval of the third tunnel was made necessary under this resolution and in 1951 applied for and obtained that approval. The Port Authority's application for the approval described the third tunnel as "a tunnel for vehicular traffic, with appropriate approaches and appurtenances, substantially similar to the existing two tubes of said [Lincoln] Tunnel for which a permit was recommended  *   *   *  and granted  *   *   *  on September 29, 1933."

The argument of the Port Authority, adopted by the Chancery Division, why approval of the two Legislatures is not also required, is that the authority in the first paragraph of section 2 of the 1931 act to construct "an interstate vehicular tunnel or tunnels (hereinafter called the Midtown Hudson Tunnel)" is authority to construct any number of tunnels at that midtown crossing so that the provision of the second paragraph that "The Port Authority shall not proceed with the construction of any additional vehicular bridges and tunnels over or under said interstate waters until hereafter expressly authorized by the two said States" is to be read, not to include a requirement for prior approval of any additional tunnels at that crossing, but only to require approval to construct tunnels at "any new and independent Hudson River vehicular crossing." An alternative argument is also made that the third tunnel, termed an adjunct tube, may

be constructed within the powers to make "additions and improvements thereto," which is language to be found in *R. S.* 32:1–121 and *R. S.* 32:1–132, respectively sections 4 and 15 of the 1931 act.

We need spend no time on the suggestion that the third tunnel is a mere addition or improvement. The third tunnel is in every way a major new crossing facility and is not the less so because it will function in harness with the existing twin tunnels.

The fallacy of the proposition that the authority to construct "tunnels" at the midtown crossing means tunnels without limit as to number and thus that the third tunnel is not an "additional" tunnel within the statutory requirement of prior legislative approval is exposed by the legislative history which led to the 1931 act. We think that history demonstrates beyond question of doubt that the power to construct tunnels at that crossing related only to the construction of twin tunnels at the crossing and was exhausted when they were completed. The corollary of course is that the prohibition against the building of "any additional * * * tunnels" until expressly authorized by the two States applies to any new tunnel whether adjunct to an existing group of a unit in a new crossing.

Certainly so significant a contraction of the sweep of the ordinary meaning of the words "any additional * * * tunnels," if it had been intended by the Legislatures, would have been expressed in clear and unmistakable terms.

Much more than the great cost is involved in the construction of a vehicular tunnel. The selection of its location is a matter of first importance. The decision will of course have a vital bearing upon the advancement of the economy of the entire Port district; but it may also entail significant social and other consequences of public concern. The Port Authority's 1952 Annual Report to the Governors and Legislatures, for example, reveals that the construction of the third tunnel "will require the relocation of some 900 families, most of them in low or middle income groups." The proper determination of what will best serve the overall

public interest in such cases is the peculiar responsibility of the Legislatures, who answer directly to the people. We are unwilling to say that the mandate against the construction of "any additional" bridges and tunnels without express legislative permission did not have in view the necessity for evaluation of all factors of public concern involved and the resolution of any conflicts according to what would best advance the general public good. The Port Authority's interpretation would sanction its building without legislative approval not merely of the third tunnel but of as many more tunnels at the Lincoln Tunnel crossing as the Authority may decide are desirable. So all-encompassing a delegation of power in a matter of such public importance and consequence should not be lightly inferred but ought plainly appear.

We turn, then, to the legislative history. Before 1930 all of the fixed vehicular crossings in the Port district were not under the supervision of the Port Authority. The Holland Tunnel, for instance, was operated by the New York and New Jersey Tunnel Commissions. In that year the pressing need for another vehicular crossing precipitated the enactment of statutes by both States, 1930 *New York Laws, chapter 420*, 1930 *New Jersey Laws, chapter 248*, appropriating $400,000, half by each State, to finance studies and investigations by the Port Authority of the practicability of a midtown tunnel and directing it to report to the Legislatures of the two States at their next sessions.

In obedience to these directions the Port Authority submitted a report on January 9, 1931. The report recommended the immediate construction of a midtown tunnel according to detailed plans submitted with the report and prepared by the Port Authority's chief engineer. These plans called for a "main tunnel under the Hudson River * * * to consist of twin tubes" estimated to cost $96,000,000. But the Port Authority did not stop with the recommendation for construction of the tunnel. Going on to say that the Port Authority Commissioners "should like to set forth certain principles which have been evolved from months of study of the transportation problem," the report developed the

extensive sweep and the dynamic nature of the vehicular transportation problem of the entire Port district and expressed the considered judgment that an obviously more effective approach to its solution could be realized from the concentration in a single agency of all powers of construction, operation, maintenance and control of all existing and any new crossing facilities. Emphasis was placed particularly upon the advantage to be realized from the pooling of the revenues of all facilities to achieve a self-supporting network by permitting the pledge of pooled revenues in support of the issuance of bonds to finance new facilities as the need for them arose, and thereby avoid burdening the general taxpayer.

The report observed that "vision, courage, competency, careful studies and serious application are necessary to its solution [the then existing and foreshadowed vehicular transportation problem]." "Each new facility must be located at the most advantageous point. They all must be under unified control and operation. Unsound and expensive financing, hit-or-miss location, unrelated operations and lack of foresight must be avoided." The report urged that the States "now establish a sound, constructive policy that will anticipate the needs of vehicular traffic within the Port District and carry forward the construction of facilities to meet such needs * * *."

Of especial pertinence to the problem before us is the specific recommendation that the program "include immediate authorization of the Midtown Hudson Tunnel and constant study of the situation so that further construction may be anticipated and recommendations made to the Legislature for authorization to construct additional facilities as traffic demands may require," which the Port Authority viewed as an essential part of "a sound public policy pursuant to which the Port Authority may proceed not only to construct the next vehicular crossing [that is, the midtown tunnel] but also to have directions in a general program of construction which will provide, as the necessity arises, all adequate accommodations."

The response of the two States was prompt. In less than two months New York, by 1931 *Laws, chapter* 47, effective March 4, 1931, and New Jersey, by *Laws* 1931, *chapter* 4, effective March 2, 1931, *R. S.* 32:1–118 *et seq.*, enacted the recommended unification program. The construction, maintenance, operation and control of all vehicular bridges and tunnels then existing or thereafter to be constructed were unified under the Port Authority subject to the reservation, here in question, that any bridges and tunnels additional to existing facilities and the authorized midtown crossing were not to be constructed until expressly authorized by the States. The Holland Tunnel was turned over to the Port Authority. Provision was made for the pooling of revenues and their use to finance or secure the financing of the construction, maintenance and operation of existing and future facilities.

It is at once evident that authority to construct the "tunnel or tunnels (hereinafter called the Midtown Hudson Tunnel)" had reference solely to the twin tunnels recommended by the Port Authority and described and illustrated in considerable detail in the charts and drawings submitted to the Legislatures with the plans of the chief engineer. Any further additions to the group of existing bridges and tunnels and to the twin-tunnel Lincoln Tunnel crossing are inclusively embraced within the "any additional bridges and tunnels" which the Port Authority was explicitly directed were not to be built until expressly authorized by the two States on the basis of studies, surveys and investigations contemplated to be a continuing activity of the Authority.

We consider it obvious also that neither the Legislatures nor the Port Authority contemplated in 1931 that a new tunnel taking the form of a third tunnel at the Lincoln Tunnel crossing would be excepted from the requirement of prior legislative approval, particularly a third tunnel in fact purposed as a new and major crossing facility to be used in such manner as to afford the traffic relief that might be expected of a new crossing at another location.

The inclusive restraint against further construction without express authorization was clearly responsive to the

Port Authority's request for "directions in a general program of construction" in the form of a statute making provision for "constant study of the situation so that further construction may be anticipated and recommendations made to the Legislatures for authorization to construct additional facilities as traffic demands may require." There is no suggestion here of any exceptions to the requirement of legislative approval. If the curb invited by the Port Authority itself is now deemed by it to be too restrictive, the agency nonetheless remains duty bound to be obedient to it until the Legislatures jointly eliminate or modify it. Neither the Port Authority nor the courts may disregard its plain terms. We need not decide whether the Legislatures imposed the restraint in consideration of the great cost of such projects, a matter doubtless prominently in mind in 1931 at the onset of the Great Depression, or because the Legislatures recognized in that way the responsibility which is primarily theirs to weigh the several factors of public concern involved in the decision of the necessity for and practicability of a project of such magnitude, or because the Legislatures were fully aware that, although the Governor of each State may exercise a veto power over any action of any Port Authority Commissioner appointed from his State, *R. S.* 32:1–17, the legislative withdrawal or modification of authority once given requires the concurrence of both Legislatures and cannot be accomplished by one Legislature alone. One or all of these considerations. and doubtless others, would reasonably explain why the restraint is expressed in unequivocal and inclusive terms. In any event, it is our duty to declare the law to be as the Legislature has written it. It follows that the Port Authority has no authority to proceed with the construction of the third tunnel until expressly authorized to do so by the two States.

Reversed.

JACOBS, J. (with whom BURLING, J., agrees, dissenting). The Port Authority, acting with the full approval of the Governors of New York and New Jersey, has embarked on an

enlargement of the Lincoln Tunnel which contemplates the construction of a third tube. No one seems to deny that the enlargement has been well and carefully planned and is desperately needed for the welfare of the people of our state. Nevertheless, the court strikes it down for lack of further legislative approval which, as we read the terms of the governing statute, is wholly unnecessary.

In *section 2, chapter 4* of the *Laws of* 1931 the Port Authority was "authorized and empowered to construct, own, maintain and operate an interstate vehicular tunnel or tunnels," called the Midtown Hudson (now the Lincoln) Tunnel together with such approaches and connections with highways as the Port Authority may deem necessary or desirable. The Legislature did not provide that the tunnel shall consist of one, two or three tubes; on the contrary, it deliberately used the general language which authorized the operation of an interstate vehicular tunnel or tunnels to be known as the Midtown Hudson (now the Lincoln) Tunnel and to be constructed within the geographic limits set forth in the statute. It may hardly be disputed that this language, standing alone, is ample authority for the first tube which was completed in 1937, for the second tube which was completed in 1945, and for the proposed third tube scheduled for completion in 1957. It is true that a second paragraph in section 2 provides that the Port Authority shall make studies to determine the necessity and practicability of "additional vehicular bridges and tunnels" and shall not proceed with the construction of any "additional vehicular bridges and tunnels" until expressly authorized by both States. But it seems to us that here the Legislature was referring to any new proposed crossings over or under the waters in the Port of New York district, wholly apart from the Lincoln Tunnel. The reference to additional vehicular bridges could have no relation whatever to the Lincoln Tunnel and indicates that the Legislature was then concerned with new and unrelated crossings; and the conjunctive use of the word "tunnels" at that particular point would appear to refer equally to new proposed crossings unrelated to the Lincoln Tunnel. *Noscitur a sociis—*

language may be known by "the company it keeps." *Ben Ali v. Towe*, 30 *N. J. Super.* 19 (*App. Div.* 1954). *Cf. Absecon v. Vettese*, 13 *N. J.* 581, 588 (1953).

In support of its contrary construction the majority opinion goes beyond the terms of the statute and refers extensively to legislative history. Where there is no ambiguity there is ordinarily no necessity for judicial construction; however, we in no wise question the use of the history if it actually sheds light on the meaning of the statutory language. See *United States v. Universal C. I. T. Credit Corp.*, 344 *U. S.* 218, 221, 73 *S. Ct.* 227, 97 *L. Ed.* 260 (1952). The report which preceded the 1931 legislation did recommend a twin-tube tunnel and it may be assumed that such construction was expected by the Legislature. But much more significant is the fact that the Legislature deliberately did not bind the Port Authority to the construction of a twin-tube tunnel but used broad, general phraseology which evidenced its intent to leave the matter to the expert discretionary judgment of the Authority. As Judge Learned Hand has so often stressed, the words actually employed by the Legislature are still "the most important single factor in ascertaining its intent." See *Commissioner of Internal Revenue v. Ickelheimer*, 132 *F. 2d* 660, 662, 45 *A. L. R.* 556 (*C. C. A.* 2 1943). If the Authority had built no more than a single tube upon the view that the public interest warranted no further construction, there could be no suggestion that it had improperly disregarded the legislative contemplation of twin tubes; similarly, we fail to see how the Authority's conclusion that the public interest requires three tubes can be said to constitute an improper disregard of legislative contemplation. Many great constitutional provisions and social enactments couched in general terms were actually brought about by narrow situations confronting the deliberative bodies. Yet it is clear that to meet changing needs they are properly given life and vigor in accordance with the sweep of their terms and are not confined to their narrower antecedents. As expressed in Professor Horack's revision of *Sutherland*, statutes embodying general terms are to be applied not only

to pre-existing situations but also to conditions that later come into existence, and general legislation is to be given "elastic operation if it is to cope with changing economic and social conditions." 2 *Sutherland, Statutory Construction* (*3d ed.* 1943), § 5102.

The majority opinion suggests that since the construction of the new tube involves not only financial costs but other social matters such as the relocation of families, specific approval should be in legislative hands. This point of view may equally be expressed as to additions and improvements not involving the construction of a tube but there it is conceded by all that no such specific legislative approval is required. As we view the matter, the Legislature effectively vested the public responsibility directly in the Port Authority acting with the approval of the Governor who, as the elected representative of all of our people, was deemed to be peculiarly equipped to evaluate and protect the interests of the entire State.

If we are to discharge our function faithfully we must seek and effectuate the overriding legislative plan. When the 1931 statute was enacted a primary legislative objective was to entrust to the Port Authority comprehensive and continuing power to construct and operate the Lincoln Tunnel in such manner as to meet the vital traffic needs of future as well as present generations; that such needs might call for the enlargement of the Lincoln Tunnel by the addition of a tube within the geographic limits prescribed may readily be assumed to have been envisioned. Wholly consistent with and complementary to the foregoing objective was the legislative purpose to have the Port Authority study the needs for new and unrelated additional crossing projects, either bridges or tunnels, and submit them for approval. The statutory language was appropriately expressed to achieve both of these ends and should be given such effect. Although we are not entirely in accord with Judge Drewen's restrictive approach to the use of extrinsic materials as interpretative aids, we adopt generally the views which are expressed fully and persuasively in his opinion below. See *Port of New*

*York Authority v. Weehawken*, 27 *N. J. Super.* 328 (*Ch. Div.* 1953).

We would affirm the judgment for plaintiffs entered in the Chancery Division.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT and BRENNAN—4.

*For affirmance*—Justices BURLING and JACOBS—2.