STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v.
COREY A. COHEN, ROBERT M. PATE AND ERIC
COOPERMAN, DEFENDANTS-RESPONDENTS.

Argued January 25, 1977—Decided May 19, 1977.

*Mr. Willard E. Byer, Jr.,* Assistant Prosecutor, argued the cause for appellant (*Mr. Joseph C. Woodcock, Jr.,* Bergen County Prosecutor, attorney).

*Mr. Francis A. Mulhern* argued the cause for *amicus curiae* The Port Authority of New York and New Jersey (*Mr. Herbert Ouida* on the brief).

*Mr. Thomas Pisarri* argued the cause for respondents (*Messrs. Lucianna, Bierman and Stillman,* attorneys).

The opinion of the court was delivered by

HUGHES, C. J. On the petition of the State we certified this case, 71 *N. J.* 344 (1976), primarily because we were concerned with the basis on which the Appellate Division had affirmed (139 *N. J. Super.* 561 (1976)) a Law Division order suppressing evidence seized on a warrantless search of a motor vehicle. The Appellate Division, setting aside all other issues, approved the invalidation of the search upon the single ground that those police officers who conducted it were police of the Port Authority of New York and New Jersey and had no legal or jurisdictional authority to arrest at the particular place where it occurred. The former Port of New York Authority, now the Port Authority of New York and New Jersey, *N. J. S. A.* 32: 1–4, *L.* 1972, *c.* 69, § 1 (hereafter "Authority"), was admitted as *amicus curiae.* It challenges the determination of the Appellate Division that the port authority police lacked territorial jurisdictional authority in the present case, because of limitations in the statute conferring jurisdiction.[1]

---

[1] *N. J. S. A.* 32:2–25.

Members of the police force appointed by the port authority may arrest on view, and without warrant, and conduct before the nearest magistrate of the municipality in which the arrest is made, or a magistrate of any neighboring municipality, any person violating, within the jurisdiction of this state, any order, rule or regulation of the port authority for the regulation and control of highway traffic on any bridge or in any tunnel owned or operated by it or under its

While the gravamen of the questioned rulings concerns the jurisdictional matter, the intrinsic validity of the search and seizure, territorial jurisdiction apart, is also challenged.

On March 20, 1974, Corey Cohen was arrested while driving his van on the George Washington Bridge, an Authority facility. The arresting officer was Authority police officer Richard Murphy, who charged Cohen with two offenses, possession of more than 25 grams of marijuana in violation of *N. J. S. A.* 24:21–20 subd. a(4), and operating his van while his license was revoked, in violation of the motor vehicle statutes. Cohen was released on bail and his vehicle was impounded. It remained briefly on Authority property and was later removed for storage to a garage in Fort Lee, New Jersey. Fort Lee is outside the "bridge" area of the Authority but is wholly within the "Port District" delineated by *N. J. S. A.* 32:1–3, which includes all or part of nine New Jersey counties, as well as all or part of several counties in New York. The garage proprietor was advised to notify the Authority police when Cohen sought to retrieve his van.

A Bergen County Grand Jury promptly indicted Cohen and he was haled to court on April 26, 1974, but did not appear. A bench warrant was issued for his arrest, but upon his appearance for arraignment on May 31, 1974, the court withdrew or "cancelled" the warrant and restored him to bail.[2]

On June 11, 1974, Cohen called the garage owner to arrange to retrieve his vehicle, and the owner advised Of-

---

jurisdiction or control or on any of the entrance or exit plazas or approaches adjacent or appurtenant thereto, including, but not limited to, rules and regulations regarding the payment of tolls. *In addition, the members of such police force shall have all the powers conferred by law on police officers or constables in the enforcement of laws of this state and the apprehension of violators thereof. L.* 1932, *c.* 113, § 1 (emphasis added).

[2]Cohen's indictment was later disposed of by his plea of guilty to one count on March 20, 1975, his service of a short time in the Bergen County Jail and a probationary term of two years.

ficer Murphy, requesting instruction as to whether to release the van. Murphy reviewed his "arrest file" which did not show the intervening invalidation of the bench warrant. Believing it still in effect, he consulted his superiors and was ordered, along with a fellow officer, Sergeant Garcia, to apprehend Cohen at the Fort Lee garage.

On arrival there he learned from a phone call which Cohen made while en route to the garage that Cohen was preparing to depart the state as soon as he obtained his van. Cohen eventually arrived at the garage, as a passenger in another vehicle occupied by two companions, Pate and Cooperman, Pate being the driver. Cohen entered the garage office and was arrested because he was unable to convince the officers that the bench warrant had been withdrawn.

After a few minutes Cooperman entered the garage office and he too was detained. Pate had remained in the driver's seat of the vehicle, and Garcia and Murphy approached it warily from opposite sides. After a sequence of events about which there is sharp factual dispute, the officers, noting the odor of marijuana fumes, searched the vehicle. They discovered a tin containing marijuana and a pipe filled with marijuana, still smoking, in the ash tray. The officers then placed Pate, Cooperman and Cohen under arrest for possession of that marijuana.

The motion to suppress evidence was brought before the court pending the presentation of this alleged later offense to the grand jury.

With regard to the dispute over what occurred immediately before the search, the motion judge accepted the version of the police officers as true, as shall we (with one important exception which we shall discuss after examining the jurisdictional question involved):

[W]hen Cohen entered the office, he was placed under arrest and when one of the officers walked over to the van, a door was open; marijuana was smelled and a quantity of marijuana was found concealed in the van. The officer testified that upon smelling the mari-

juana he placed the other two defendants under arrest and made a search incident to such arrest.

## THE SCOPE OF JURISDICTION

It would seem appropriate to deal first with the principal basis upon which both decisions below were predicated, namely, that under the statute footnoted above the powers of Authority police officers, no matter their inherent scope, may be exercised only within the narrow geographical ambit of the "bridge," "tunnel," "plaza," or "approach" facilities mentioned therein.

One would be inclined to pause at the threshold to question this narrow supposition for several reasons, not the least being the broad scope of the statutory language itself:

In addition, the members of such police force shall have all the powers conferred by law on police officers or constables in the enforcement of laws of this state and the apprehension of violators thereof. [*N. J. S. A.* 32:2–25].

But the courts whose actions we review sensed a relationship between this clause and the sentence which preceded it. The motion judge held:

The Port Authority police had absolutely no authority to pursue the course of conduct that was followed by them on June 11, 1974. *N. J. S. A.* 32:2–25 * * * states the ambit of the Port Authority police's power. The legislature gave the police express authority to act in the same capacity as any other police force but only within Port Authority territory, i. e. bridges and tunnels * * *.

By the same token the Appellate Division determined that:

This legislative authority limits the geographical area within which Port Authority police may exercise police powers to "any bridge or in any tunnel owned or operated by [the Port Authority] or under its jurisdiction or control or on any of the entrance or exit plazas or approaches adjacent or appurtenant thereto." Concededly, the ABC Towing Garage premises in Fort Lee were beyond the perimeter of this jurisdictional limitation. We do not consider that the last sentence of the statute which equates the extent of the

powers of Port Authority police with that of all police officers in any way expands the jurisdictional limits within which Port Authority officers may exercise such powers. [139 *N. J. Super* at 564].

However, the language of the first sentence of the statute does not expressly limit the arrest jurisdiction of the police to any particular area. The reference to bridges and tunnels are not specifications of the exclusive locale of any arrest, but only part of the substantive description of the offense for which an arrest may be made. And, of most significance, the last sentence of the statute bespeaks law enforcement powers within the full authority of police officers, not merely Authority police, and therefore not limited by implication to those places only where may occur routine traffic or tolls offenses in violation of Port Authority "order, rule or regulation."

Legislative history, as well as Authority expansion over the past half century, would seem to place severe strain upon the validity of the thesis of the motion judge and Appellate Division, not to speak of the different categories of enforcement objectives contemplated by the statutory grant of power itself. The more limited scope of the first sentence deals with violation of "any order, rule or regulation of the port authority for the regulation and control of highway traffic on any bridge or in any tunnel * * *", factors which become irrelevant once those confines are left behind. Manifestly, traffic regulation applicable to bridge or tunnel passage is not germane to events which might occur after that passage has ended, and the traveler has emerged from such tunnel or bridge to rejoin the non-Authority community. Such a person in the general community remains subject of course to "the laws of this state" whose enforcement by Authority police is contemplated under the specific terms of the second sentence of the statute.

The narrow limitation in the first statutory provision — to offenses occurring within tunnels, bridges, plazas and approaches — is understandable since at the time of its en-

actment these were the only transportation facilities operated by the Authority. *See N. J. S. A.* 32:1–119. But the years have broadened the functional scope of the Authority. By compact between New York and New Jersey with consent of Congress *(N. J. S. A.* 32:1–1 *et seq.;* N. Y. Unconsol. Laws § 6401 *et seq.* (McKinney 1961) ; H. R. J. Res. 337, 67th Cong., 2d Sess., 42 Stat. 822 (1922) ; S. J. Res. 88, 67th Cong., 1st Sess., 42 Stat. 174 (1921)) the Authority serves not only the citizens of those states, but the nation itself. Since the birth of the Authority in 1921 and since the enactment of *N. J. S. A.* 32:2–25 in 1932, the Legislature has authorized the Authority, *inter alia,* to operate truck terminals, *N. J. S. A.* 32:1–141.1 (1945), bus terminals, *N. J. S. A.* 32:2–23.1 (1946), air terminals, *N. J. S. A.* 32:1–35.1 (1947), marine terminals, *N. J. S. A.* 32:1–35.28 (1948), railroad facilities and the World Trade Center, *N. J. S. A.* 32:1–35.50 (1962). Under the latter statute, the Authority, *inter alia,* operates the Port Authority Trans Hudson (PATH) system, carrying 75,000 commuters a day.

This enlarged presence and function of the Authority brings into sharp focus the implications of the holdings under review. Those courts, of course, were not dealing, as such, with police power of the Authority force in the area of its many other responsibilities, such as at its airports, but rather with its impact on events occurring in the non-Authority public sector, that is to say off the actual site of its facilities but within the Port District. Nevertheless the unconditional tone of both opinions, oriented to the bridge-tunnel theme, might well be understood as applying to the broader activities of the Authority, a result wholly unrealistic and, we think, insupportable, when one considers the sensible thrust of the broad grant of power in the second sentence of the statute we discuss. We think the Legislature, in enumerating the powers of Authority police in 1932, must have visualized the future scope and potential

of Port Authority function,[3] and thus meant what it said in its broad grant of police force powers.

It seems of significance, too, that when the Legislature, post-1932, authorized the creation of various facilities as mentioned above (extending far beyond bridges, tunnels, plazas and approaches) it did not deem it necessary to update and restate *N. J. S. A.* 32:2–25. Rather, it must have assumed that the traffic control police powers once confined to tunnels and bridges, plazas and approaches were always intended to extend to added and different Authority facilities. This is apparent in the Rules and Regulations approved by the Legislature in 1951 to govern traffic in Authority air and marine terminals, which provide in part:

All persons on any air terminal highway or marine terminal highway must at all times comply with any lawful order, signal or direction by voice or hand of any member of the Port Authority police force. [*N. J. S. A.* 32:1–154.18(3)].

And traffic control aside, to confine the broad police powers of the second sentence of the statute to tunnels and bridges, plazas and approaches would lead to the absurd result of leaving important Authority facilities unpoliced. The Authority's power to perform police functions at Newark International Airport was implicitly acknowledged by this Court in *In re Asbury-Red Bank Limousine Serv.*, 55 *N. J.* 551, 556, 557 (1970), wherein we discussed the agreement between the City of Newark and the Authority, vesting in the latter responsibility to provide "police for patrolling, for guarding and for traffic control" and relieving Newark of that responsibility. It is inconceivable that an

---

[3]The compact makes it clear that it was envisioned that the Port Authority would be called upon to perform functions beyond the operation of tunnels and bridges:

The port authority shall constitute a body, both corporate and politic, with full power and authority to purchase, construct, lease and/or operate any terminal or transportation facility within said [Port] district * * *. [*N. J. S. A.* 32:1–7 (1921)].

Authority policeman, personally observing an armed robbery or an atrocious assault and battery being committed on the very premises of Newark International Airport, for instance, was not intended by our Legislature to have authority to interfere with the commission of such crime and to apprehend and arrest such a criminal.

The bi-state Authority police force consists of approximately 1,200 members who are responsible, in practice, for law enforcement at every Port Authority facility. They are assigned and act interchangeably between the compact states. In addition to normal police functions, members of that force are called upon to discharge duties which are unique to the Authority's operations. For example, in accordance with the Federal Aviation Administration's anti-hijacking program, members of the Authority police force must be assigned to security points at airports operated by the Authority. Additionally such police are charged with responsibility to investigate cargo thefts at marine and air terminals operated by the Port Authority. The narrow interpretation below of *N. J. S. A.* 32:2–25 would seem to create a real and unnecessary danger to public safety at all Authority installations in New Jersey, at some of which, as noted, Authority police officers provide the only police presence. The long period of legislative acceptance of the Authority police role in its broad sense,[4] as well as the continuous practice of the Authority, some of which we have mentioned, would seem to be significant under the holding

---

4It is doubtful that the New Jersey Legislature was ever unaware, over all the years of Authority expansion, of the scope of ongoing Authority police action. It was constantly reminded of it, as on May 4, 1970, when then-Executive Director Austin J. Tobin testified in favor of the Senate Bill which later became the Waterfront and Airport Commission Act, *L.* 1970, *c.* 58:

The Port Authority's police have always worked diligently and in cooperation with other law enforcement agencies in connection with investigation and proper prosecution in the case of reported thefts of cargo at our airports.

of this Court in *Pringle v. New Jersey Dep't of Civil Serv.*, 45 *N. J.* 329, 332–34 (1965):

> The principle is well established that resort may be had to long usage, contemporaneous construction and practical interpretation in construing statutes, to ascertain the meaning of technical terms, to confirm a construction deduced from the language, to explain a doubtful phrase or to ascertain the meaning of a phrase if obscurely expressed. * * *
>
> Furthermore, the continuous practical interpretation of the statute by the Commission over a period of years without interference by the Legislature is evidence of its conformity with the legislative intent. * * *
>
> More importantly, the practical construction of this statute and the acceptance thereof being of such long standing, we know of no reason why we should compel departure from it now. [Citations omitted].

In determining the full and legislatively intended scope of the second sentence of *N. J. S. A.* 32:2–25, the legislative attitudes and Authority practices referred to are therefore important in considering the contending viewpoints of the litigants and *amicus*. The defendants-movants contend of course that no police power whatever exists outside tunnel, bridge, plaza or approach — that it expires once these confines are left. And hence that it could not have existed at the garage in Fort Lee where the challenged search and arrests were made. The State contends that the powers are viable throughout the Port District above described. The Authority urges, more expansively, that the police powers statutorily intended embrace the whole of the State of New Jersey, pointing out that such is the scope of Authority police powers in New York, our sister compact state. N. Y. Crim. Pro. Law §§ 1.20, subds. 34(k), 34–a(c), 36 & § 140.10 (McKinney 1971).[5] The Authority reminds us of the desirability of a common "path of judicial decision" once mentioned by this Court in *Moonachie v. Port of N. Y. Auth.*, 38 *N. J.* 414, 425 (1962):

---

[5]Resolution of this question as to the statewide exercise of power is not necessary to decision here, and we leave it to another day.

Since the Authority is an instrumentality of New York and New Jersey, it is eminently desirable, of course, that the path of judicial decision in the courts of the two States be a common one.

It asserts that *N. J. S. A.* 32:2–25 tracks the language employed by the Legislature in 1921 in defining the powers of the State Police (*N. J. S. A.* 53:2–1, as amended) which are statewide. It contrasts the careful legislative definition of the more limited jurisdictional powers of a municipal police force "within the territorial limits of the municipality." *N. J. S. A.* 40A:14–152.

■ And the State recognizes too that generally a governing body can directly exercise its police power only within its jurisdictional boundaries, absent a statute broadening those powers. 1 *C. Antieau, Municipal Corporation Law* §§ 5.10, 5.12 (1975). Consequently police officers can normally exercise the powers inhering in their office only within the confines of the jurisdiction which employs them. *N. J. S. A.* 40A:14–152; *State v. Williams,* 136 *N. J. Super.* 544, 548 (Law Div. 1975) ; 5 *Am. Jur.* 2d, *Arrest* § 50 (1962).[6]

■ ■ We conclude that the police powers described in the first sentence of the statute — to arrest on view and without warrant a violator of any order, rule or regulation of the Authority for the regulation and control of traffic on bridge, tunnel, plaza or approach — extend, by manifest legislative intent, to all other facilities now operated by the Authority. We determine further, because of the legislative intent implicit in the second, and broader, sentence of the statute, that the powers expressed therein without limitation, must have been intended to embrace not only the bridge-tunnel complex and its enlargement, that is to say all other

---

[6]We do not find it necessary here to consider the "fresh pursuit" concept, *see, e. g., N. J. S. A.* 2A:156–1 *et seq., State v. Williams,* 136 *N. J. Super.* 544, 548 (Law Div. 1975) or the right of citizen arrest in a private capacity, *see, e. g., State v. McCarthy,* 123 *N. J. Super.* 513, 517–18 (Cty. Ct. 1973). The latter issue was rejected by the Appellate Division, for one reason, as having been untimely raised, 139 *N. J. Super.* at 564–65.

Port Authority facilities, but the whole territorial area of the Port District itself. In this determination we are guided, *inter alia,* by the practical sense of the words of Justice Jacobs for this Court in *Jersey City Chapter Prop. Owner's etc. Assoc. v. City Council,* 55 *N. J.* 86, 100–01 (1969):

> When all is said and done, the matter of statutory construction here will not justly turn on literalisms, technisms or the so-called formal rules of interpretation; it will justly turn on the breadth of the objectives of the legislation and the commonsense of the situation. *See City of Clifton v. Zweir,* 36 *N. J.* 309, 322–323 (1962); *State v. Gill,* 47 *N. J.* 441, 445 (1966); *cf. Lloyd v. Vermeulen,* 22 *N. J.* 200, 204–206 (1956); *Alexander v. N. J. Power & Light Co.,* 21 *N. J.* 373, 379 (1956). * * *
>
> *     *     *     *     *     *     *     *

In *Safeway Trails, Inc. v. Furman, supra,* 41 *N. J.* 467, the question raised was whether a statutory excise tax imposed on buses operating on New Jersey's highways was applicable to toll roads such as the New Jersey Turnpike and the Garden State Parkway. The question was answered in the affirmative by this Court which readily construed the tax as applicable to toll roads though, in the language of the opinion, they were certainly not within the "specific contemplation" of the legislators when they enacted the statute. 41 *N. J.,* at 477; *see* 2 *Sutherland, supra,* § 5102, at 509–10:

> Standards established by the medium of legislation are usually intended to have considerable breadth with the result that a statute may cover many situations that do not immediately occur to the mind. And so it is a general rule of statutory construction that a statute, expressed in general terms and words of present or future tense, will be applied, not only to situations existing and known at the time of enactment, but also prospectively to things and conditions that come into existence thereafter. Legislation must be given elastic operation if it is to cope with changing economic and social conditions.

Assuming the territorial jurisdiction of the Authority officers, which we have determined to exist, we turn to the question of the validity of the search, seizure and arrest made by them as above described.

### THE INTRINSIC VALIDITY OF THE SEARCH

█ The motion judge, in considering the whole factual context of the search, stated in his opinion (statement in

accordance with *R.* 2:5–6(c)) that "when one of the officers walked over to the van, the door was *open;* marijuana was smelled" and the search ensued (emphasis added). If this was meant to imply that the vehicle door was casually or coincidentally "open," so that the perception by smell of the odor of marijuana might justify the search, we believe an error in dictation or transcription must have occurred, making necessary a correction of the record. Our careful examination of the motion testimony discloses that all witnesses agreed that the door was affirmatively "opened" rather than casually "open." Both police officers testified that they opened the respective doors of the vehicle and only then were confronted with the smell of marijuana which inspired the search. The defense testimony was that the driver, Pate, opened the driver's side door and stepped out of the vehicle under armed police threat and command. No one testified that the door was coincidentally "open." The motion judge himself, at the conclusion of testimony, in mentioning a "crucial point" in the case, and inviting memoranda of law thereon, posed the question "was there a smell of marijuana when that door was opened and Mr. Pate got out of the car?"

It is apparent that we should amend the motion judge's opinion to concord with the undisputed proofs before him. We therefore conclude that the door was "opened" either by the police or by Pate at their command. The legal result is the same. Was there justification or probable cause to open the door and, perceiving a possible violation of law, to search the van? We think not. The arrest of Cohen on the invalid warrant was complete. No reasons existed to suspect or implicate Cohen's companions in any precedent or current offense (his had occurred almost three months before).

We therefore agree with the sense of Judge Smith's finding that there was no justifiable reason or probable cause for the officers to make the initial intrusion by opening or compelling the occupant to open the van doors.

The warrantless search of the vehicle conducted by the Authority police officers fits none of the relevant exceptions to the general search warrant requirement. Since the police officers lacked probable cause to open the vehicle door, the moving vehicle exception to the general requirement cannot be relied on. *See Chambers v. Maroney,* 399 *U. S.* 42, 90 *S. Ct.* 1975, 26 *L. Ed.* 2d 419 (1970); *Carroll v. United States,* 267 *U. S.* 132, 45 *S. Ct.* 280, 69 *L. Ed.* 543 (1925); *State v. LaPorte,* 62 *N. J.* 312, 316 (1973). For the same reasons the "plain view" exception is inapplicable. *See Harris v. United States,* 390 *U. S.* 234, 88 *S. Ct.* 992, 19 *L. Ed.* 2d 1067 (1968); *State v. McKnight,* 52 *N. J.* 35, 56–57 (1968). Finally, the factual circumstances of Cohen's arrest do not support a search incident to a valid arrest. *See Chimel v. California,* 395 *U. S.* 752, 89 *S. Ct.* 2034, 23 *L. Ed.* 2d 685 (1969).

The motion to suppress was properly granted.

The decision of the Appellate Division is modified, and as so modified, affirmed.

PASHMAN, J., concurring. I concur in the opinion of the Chief Justice. However, I would address the Port Authority's assertion that its police jurisdiction extends beyond the Port District and its facilities. Ths issue, which is expressly reserved in the majority opinion, see *ante* at 341 and n. 5, is concededly not essential to the resolution of this appeal, but I believe that we should dispel any doubts concerning the breadth of the Authority's jurisdiction by definitively interpreting *N. J. S. A.* 32:2–25 to confer statewide powers on its police force. The issue has been fully briefed and argued by the parties, and *amicus curiae* Port Authority has represented to us that such powers are necessary to perform its various functions.

In addition, there is a public interest in clear delineation of law enforcement responsibilities and powers. The State Police and various municipal police forces have a legitimate interest in knowing whether they will be free to

leave certain tasks to Authority police officers, or whether they are legally compelled to discharge certain functions themselves outside the Port District. While the Court's opinion will resolve many of these difficulties because the Port District encompasses a considerable area of the State, see *ante* at 334, *N. J. S. A.* 32:1–3, many crimes, such as cargo thefts, necessitate investigative work, and may require arrests in other parts of the State. Rather than utilize the exclusionary rule as a vehicle to define the Authority's jurisdiction, and thus endanger an otherwise valid arrest or search, *cf. State v. Bisaccia,* 58 *N. J.* 586 (1971), we should take this opportunity to determine the full sweep of *N. J. S. A.* 32:2–25.

My willingness to address this issue is reinforced by the thorough canvassing of the statutory history and relevant policy considerations in the Court's opinion. I have little to add to this treatment. The broad range of Authority activities; the unqualified nature of the statutory language conferring jurisdiction; the long-standing legislative acquiescence to the Authority's extensive police role; and the desirability of conforming with New York's practice, all support a liberal reading of *N. J. S. A.* 32:2–25. The only countervailing factor is the supposed desirability of confining the Authority police to the territorial limits of their employer, in a manner similar to the limitation expressly placed on municipal police by *N. J. S. A.* 40A:14–152. *See State v. Williams,* 136 *N. J. Super.* 544, 548 (Law Div. 1975). Such a restriction would prevent any jurisdictional conflicts which might stem from overreaching by the Authority police. However, the language of *N. J. S. A.* 32:2–25 contains no comparable limitation on the powers granted to Authority police. Furthermore, this concern for overlapping responsibilities should have little bearing on the scope of the Port Authority's police jurisdiction since its activities outside the Port facilities are likely to be related to a specialized range of responsibilites whch are far re-

moved from the standard fare of municipal, or even State, police. See *ante* at 337, 338.

Far more persuasive, in my view, is the grant of jurisdiction enjoyed by Authority police officers in New York, see *ante* at 340, and the need for uniform treatment in both states. Although New York's jurisdictional grant is clearly set forth by statute, we should presume, in the absence of any compelling policy reasons, that our own Legislature would welcome a judicial interpretation which encourages common treatment of the Authority police in both states. *Cf. Moonachie v. Port of New York Authority*, 38 *N. J.* 414, 425 (1962), in which Justice Francis said: "Since the Authority is an instrumentality of New York and New Jersey, it is eminently desirable, of course, that the path of judicial decision in the courts of the two States be a common one."

Consequently, I would reach the issue posed in footnote 5 of the Court's opinion and hold that *N. J. S. A.* 32:2–25 permits the Authority police to exercise "all the powers conferred by law on police officers" throughout the State.

Justice SCHREIBER joins in this opinion.

CLIFFORD, J., concurring in result. While there are valid policy considerations favoring the majority's broad view of Port Authority police jurisdiction (and perhaps supporting even more strongly the approach of Justice Pashman), I would respect what I understand to be the legislative intent and affirm the judgment below, without modification, substantially for the reasons given by the Appellate Division, 139 *N. J. Super.* 561 (1976). The restrictive language of the first sentence of *N. J. S. A.* 32:2–25, pertaining to the arrest of any person "violating, within the jurisdiction of this State, any order," etc., quite plainly serves to distinguish a violation of traffic rules, regulations or orders occurring on port facilities within the jurisdiction of the State of New Jersey (the only one our statutes could reach) from such a violation occurring within the State of New York.

The statute as I read it provides for enforcement by Port Authority police of all laws of this State on the Port Authority facilities mentioned in the statute — and nowhere else. While I might look at the problem differently were the task of establishing policy in this field my responsibility, which of course it is not, I nevertheless can perceive some good and sufficient reasons for the legislature's desire to impose a severe limitation on the area in which Port Authority police should function, not the least of which is a reluctance to encourage the intromission of these officers in their exercise of police power across the jurisdictional lines of other governmental entities and other law enforcement agencies.

Judge CONFORD authorizes me to record his concurrence in this opinion.

CLIFFORD, J., and CONFORD, P. J. A. D., concurring in the result.

*For modification and affirmance*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.

*For reversal*—None.