819 F.2d 413
 The PORT AUTHORITY POLICE BENEVOLENT ASSOCIATION, INC., and
Dominick Evangelista, individually and as
President of the Port Authority Police
Benevolent Association, Inc., Appellants,
v.
The PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Appellees,
Kirk Nelson, Donald F. Delano, Dennis Flavin, Charles
Cossentine, Eugene Ceccarella & George Albin (Intervenors).
 No. 86-5768.
 United States Court of Appeals,
Third Circuit.
 Argued April 21, 1987.
Decided May 27, 1987.
 
 Alfred G. Osterwell, P.A. (argued), Edgewater, N.J., for appellants.
 Hugh H. Welsh (argued), Arthur P. Berg, Anne M. Tannenbaum, Donald F. Burke, One Path Plaza, Jersey City, N.J., for appellees.
 Steven Morelli (argued), Leeds & Morelli, Carle Place, N.Y., for intervenors.
 Before WEIS, STAPLETON, and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge:
 
 
 1
 This appeal arises from a complaint for injunctive relief brought under 42 U.S.C. Sec. 1983 (1982) ("section 1983") by the Port Authority Police Benevolent Association ("PBA") against the Port Authority of New York and New Jersey ("Port Authority" or "Authority"). In January 1985, the Port Authority informed the PBA of its intention to use an expired promotion list to meet its current staffing and operational needs. After being rebuffed in its attempts to persuade the Port Authority Labor Relations panel to enjoin use of the list, the PBA filed a section 1983 action for injunctive relief in the United States District Court for the District of New Jersey. In its complaint, the PBA contended that its members had been deprived of a valuable property interest without due process of law in violation of the Fourteenth Amendment. See U.S. Const. amend XIV. In December 1985, the district court issued an opinion finding that the PBA had been deprived of a property interest without due process of law. The district court enjoined the Port Authority from further use of the expired list, and directed that the six promotions that had been made from that list be set aside. After this opinion had been filed, but before an order was entered, the individuals whose promotions were to be set aside were granted leave to intervene as defendants. The court granted their motion to dismiss the PBA's complaint on the ground that the Port Authority enjoys Eleventh Amendment immunity and is therefore not amenable to suit as a "person" under section 1983. This appeal followed. We affirm the order of the district court.
 
 
 2
 The Port Authority was created by an interstate compact entered into by New York and New Jersey in recognition of the fact that "the commerce of the port of New York has greatly developed and increased and the territory in and around the port has become commercially one center or district." N.J.Stat.Ann. 32:1-1 (West 1963); N.Y. Unconsol. Laws Sec. 6401 (McKinney 1979). The compact was created by the two states in 1921, and approved by the Congress of the United States, as required by the Constitution of the United States. See U.S. Const. art. 1 Sec. 10. We must determine whether such an interstate agency is an arm of the state immune from suit under the Eleventh Amendment, see U.S. Const. amend. XI, or a "person" amenable to suit under section 1983. We conclude that, under the Supreme Court's decision in Lake Country Estates v. Tahoe Regional Planning Agency, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979), and our own decision in Blake v. Kline, 612 F.2d 718 (3d Cir.1979), the Port Authority is entitled to Eleventh Amendment immunity. Cf. Mineo v. Port Authority, 779 F.2d 939, 949 (3d Cir.1985) (holding that the Port Authority should be treated as a state for Tenth Amendment purposes).
 
 
 3
 In Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, the Supreme Court of the United States held that the interstate Regional Planning Authority ("RPA") created by California and Nevada was a "person" for purposes of section 1983. The Court held that, in order to enjoy Eleventh Amendment immunity, an entity created by interstate compact must be an arm of the compacting states rather than a body "comparable to a county or municipality." 440 U.S. at 401, 99 S.Ct. at 1177. Further, there must be "good reason to believe that the States structured the new agency to enable it to enjoy the special constitutional protection of the States themselves." Id. Finally, it must be clear that "Congress concurred in [the States'] purpose." Id. To determine whether the RPA met these criteria, the Court focused on six factors: (1) How is the agency characterized by the language of the creating statutes? (2) From what governmental entity does the agency derive its funding? (3) Is the state financially responsible for the liabilities and obligations incurred by the agency? (4) Are the officers or members of the agency appointed by the state, or by county or municipal governments? (5) Is the function performed by the agency traditionally state or municipal? and (6) Are the actions of the agency subject to the state government's veto? We shall consider each of these factors in turn.
 
 
 4
 The application of the first Lake Country Estates factor is problematic, because the characterization of the Port Authority by the statutes creating it is somewhat inconsistent. The Port Authority is variously called a "joint or common [state] agency," N.J. Stat. Ann. 32:1-1 (West 1963); N.Y. Unconsol. Laws Sec. 6401 (McKinney 1979), "a body corporate and politic," N.J. Stat. Ann. 32:1-4 (West 1963); N.Y. Unconsol.Laws Sec. 6404 (McKinney 1979), a "person," N.J. Stat. Ann. 32:1-35.73(h) (West Supp. 1986), and "the municipal corporate instrumentality of the two states for the purpose of developing the port and effectuating the pledge of the states in the said compact." N.J. Stat.Ann. 32:1-33 (West 1963); N.Y. Unconsol. Laws Sec. 6459 (McKinney 1979). The term, "joint or common agency" suggests that the Port Authority is a state agency entitled to immunity; the terms, "body corporate and politic" and "person" suggest vulnerability to suit under section 1983, see Monell v. New York City Dept. of Social Services, 436 U.S. 658, 689-90 n. 53, 98 S.Ct. 2018, 2035 n. 53, 56 L.Ed.2d 611 (1978); and the term, "municipal corporate instrumentality" suggests nothing definite in either direction, although its context suggests that the Authority was meant to be a state agency.
 
 
 5
 Since the statutory language is inconclusive, we will look to guidance from the courts of New York and New Jersey to determine how the state judiciary has characterized the Authority. See Blake v. Kline, 612 F.2d at 722 (" '[L]ocal law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered[.]' ") (quoting Urbano v. Board of Managers, 415 F.2d 247, 250-51 (3d Cir.1969), cert. denied, 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970)), cert. denied, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980). The state and federal courts of New York and New Jersey have consistently, whenever confronted with the question of whether or not the Authority is an arm of the state government, held that the Authority is a state agency performing functions on behalf of the state. See, e.g., Mineo v. Port Authority, 779 F.2d at 949 ("[f]rom its inception ..., the Port Authority has been an entity of the two compacting states"), cert. denied, --- U.S. ----, 106 S.Ct. 3297, 92 L.Ed.2d 712 (1986); Newark v. Board of Taxation, 54 N.J. 171, 175, 254 A.2d 513, 515 (the Authority was created by the two states as "their joint agency"), cert. denied, 396 U.S. 987, 90 S.Ct. 483, 24 L.Ed.2d 452 (1969); The Port Authority v. Bosco, 193 N.J. Super. 696, 700, 475 A.2d 676, 678 (1984) (per curiam) (" '[q]uotations of this nature could be multiplied indefinitely' ") (quoting Whalen v. Wagner, 4 N.Y.2d 575, 152 N.E.2d 54, 57, 176 N.Y.S.2d 616, 619 (1958)); Trippe v. Port of New York Authority, 14 N.Y.2d 119, 122, 123, 198 N.E.2d 585, 586, 249 N.Y.S.2d 409, 410, 411 (1964) (the Authority is a "governmental agency" and a "direct agency" of the two states). Indeed, when confronted with the specific question of whether the Authority was suable as a municipal corporation or immune from suit as an agency of the state, the United States District Court for the District of New Jersey concluded that "the Port Authority ... is a joint or common agency of the states of New York and New Jersey. It performs governmental functions which project beyond state lines, and it is immune from suit without its consent." Howell v. Port of New York Authority, 34 F.Supp. 797, 801 (D.N.J.1940) (citations omitted). It is notable that this long-standing judicial characterization of the Authority has never been questioned by either state legislature despite the numerous opportunities to overrule these decisions presented by the periodic amendments the legislatures have made to the statutes creating the Port Authority. Thus, we conclude that the combined legislative-judicial characterization of the Authority indicates an intention on the part of New York and New Jersey that the Authority be considered a state agency for purposes of Eleventh Amendment immunity.
 
 
 6
 The next two Lake Country Estates factors focus on the financial functioning of the Authority. First, where does the Authority get its funding? At the present time, the Authority does not rely on annual appropriations from the state legislatures. However, under the original terms of the Compact,Unless and until the revenues from operations conducted by the port authority are adequate to meet all expenditures, the legislatures of the two states shall appropriate, in equal amounts, annually, for the salaries, office and other administrative expenses, such sum or sums as shall be recommended by the port authority and approved by the governors of the two states, but each state obligates itself hereunder only to the extent of one hundred thousand dollars in any one year.
 
 
 7
 N.J. Stat. Ann. 32:1-16 (West 1963); N.Y. Unconsol.Laws Sec. 6416 (McKinney 1979) (Compact Article XV). In 1931, the legislatures established a General Reserve Fund derived from the Authority's surplus revenues by which the Authority was able to become self-supporting. See N.J. Stat. Ann. 32:1-142 (West 1963); N.Y. Unconsol. Laws Sec. 7002 (McKinney 1979). Thus, the states provided the Authority with financial support initially, and then devised a system whereby it could become financially independent. Appellant sets much store by the financial autonomy of the Authority, arguing that the Authority does not meet the Lake Country Estates criteria and is not a state agency. The appellant is mistaken. While the Authority's current funding structure does not provide conclusive evidence that the Authority is an agency of the state, it is nevertheless clearly distinguishable from the funding of the RPA found damaging to that agency's immunity claim in Lake Country Estates. The fatal aspect of the RPA's funding structure was the fact that it received its funding from its participating county governments rather than the state governments. See 440 U.S. at 402, 99 S.Ct. at 1177. This fact, together with the other significant characteristics of the RPA, indicated that it was a creature of the counties rather than the states, and thus could not enjoy Eleventh Amendment immunity. The Authority's ability to be self-supporting as a result of the General Reserve Fund does not support the same conclusion. Significantly, the uses to which the money from the Authority's General Reserve Fund may be put are strictly circumscribed by periodic legislation and may only be dedicated to purposes within the Authority's statutory mandate and for the benefit of the citizens of the two states. This is in stark contrast to the RPA's use of its funds, which are directed towards the needs of the counties and their residents, and spent with no legislative input from the states. Thus, although the Authority is no longer directly funded by the states, we conclude that the history of its financial structure, and the statutory constraints placed on the use of its funds, indicate that the Authority is considered an arm of the states by New York and New Jersey.
 
 
 8
 A question closely related to the funding issue is whether or not judgments against the Authority would be binding on either of the states. Given the solvency and size of the General Reserve Fund, it is unlikely that the Authority would have to go to the state to get payment for any liabilities issued against it. See Comprehensive Annual Financial Report of the Port Authority of New York & New Jersey for the Year 1985 at 42-44. If, however, a judgment were entered against the Authority that was serious enough to deplete its resources, the Authority would be able to go to the state legislatures in order to recoup the amount needed for its operating expenses. See N.J. Stat. Ann. 32:1-16 (West 1963); N.Y. Unconsol.Laws Sec. 6416 (McKinney 1979) (Compact Article XV) ("Unless ... the revenues from operations conducted by the port authority are adequate to meet all expenditures, the legislatures of the two states shall appropriate [the amounts needed]."). Indirectly, then, a judgment against the Authority could have some impact on the state treasury. Although the fiscal health presently enjoyed by the Port Authority renders this conclusion purely theoretical, Compact Article XV nevertheless makes the states' intentions towards the Authority crystal clear: if the Authority is ever in need of financial support, the states will be there to provide it.
 
 
 9
 Finally, the last three Lake Country Estates factors all clearly support a conclusion that the Authority is a direct agency of the states rather than an independent corporation. First, the Port Authority's twelve commissioners are appointed by the governors of each state and confirmed by the state legislatures. They serve for "terms fixed and determined from time to time by the legislature of each state respectively," and are subject to removal in accordance with state law. N.J. Stat.Ann. 32:1-5 (West 1963); N.Y. Unconsol.Laws Sec. 6405 (McKinney 1979). Second, the function performed by the Port Authority--the facilitation of commerce and transportation--is a state function in sharp contrast to the traditionally municipal function of land use planning fatal to the RPA's Eleventh Amendment immunity argument in Lake Country Estates. Third, the actions of the Port Authority's commissioners are subject to veto by the governor of either state. N.J. Stat.Ann. 32:1-17 (West 1963); N.Y. Unconsol. Laws Sec. 6417 (McKinney 1979) (Compact Article XVI); N.J. Stat.Ann. 32:2-9 (West 1963); N.Y. Unconsol. Laws Sec. 7153 (McKinney 1979). The statute is replete with still other significant indicia of state control over the Authority. For example, the Authority must make annual reports to both legislatures, N.J. Stat. Ann. 32:1-8 (West 1963); N.Y. Unconsol.Laws Sec. 6408 (McKinney 1979), and both legislatures must concur in any proposed changes to the Authority's rules and regulations. N.J. Stat.Ann. 32:1-19 (West 1963); N.Y. Unconsol.Laws Sec. 6419 (McKinney 1979). Furthermore, the Authority may not take on new projects unless expressly authorized to do so by the two state legislatures. See The Port Authority v. Weehawken, 14 N.J. 570, 580, 103 A.2d 603, 608 (1954) ("the Port Authority has no authority to proceed with the construction of the third tunnel [to the Lincoln Tunnel] until expressly authorized to do so by the two States"); State Dept. of Transportation v. The Port Authority, 159 N.J. Super. 102, 104, 387 A.2d 367, 368 (App.Div.1978) (per curiam) ("the proposed highway construction cannot be undertaken or funded by the Authority without the affirmative authorization of the respective Legislatures of both states"). In sum, these limits on the operation of the Port Authority indicate that it functions as an agency of the state, not as an independent corporation.[1]
 
 
 10
 Although we conclude that the Port Authority is an agency of the state for purposes of Eleventh Amendment immunity under the Supreme Court's Lake Country Estates analysis, we do not read Lake Country Estates as setting out an exclusive list of factors to be considered in evaluating an Eleventh Amendment immunity claim. Accordingly, Lake Country Estates does not require us to ignore the insight and guidance offered by our own decision in Blake v. Kline. See 612 F.2d at 722. Blake v. Kline mentions three factors not considered by Lake Country Estates in evaluating an Eleventh Amendment immunity claim: (1) Is the entity performing a governmental or a proprietary function? (2) Does the entity have the power to sue and be sued? and (3) Is the property of the entity immune from state taxation? Examination of these additional factors does not alter our conclusion that the Port Authority is protected by Eleventh Amendment immunity.
 
 
 11
 First, the functions performed by the Port Authority are governmental, not proprietary. See Howell v. Port of New York Authority, 34 F. Supp. at 800 ("The construction, maintenance and operation of highways, bridges and tunnels is one of the primary governmental functions of the states.") (citations omitted). Accord Whalen v. Wagner, 4 N.Y.2d 575, 176 N.Y.S.2d 616, 619, 152 N.E.2d 54, 57 (1958). Second, the states of New York and New Jersey have statutorily consented to suits against the Port Authority, with the notable exceptions of suits seeking injunctive relief. See N.J. Stat. Ann. 32:1-157 ff., 32:1-161 (West 1963); N.Y. Unconsol. Laws Secs. 7101 ff., 7105 (McKinney 1979). Prior to the passage of the consent statutes, the Authority had been totally immune from suit. To the extent that these provisions constitute a capacity to "sue and be sued," there is nevertheless
 
 
 12
 no merit to defendants' contention that because the Legislature abrogated this particular attribute of sovereignty by N.J.S.A. 32:1-157 the status of the Port Authority as a state agency was thereby withdrawn in all other respects. Indeed, the State of New Jersey itself, as well as all public entities within its boundaries, is answerable to suit. New Jersey Tort Claims Act, N.J.S.A. 59:1-2 et seq.
 
 
 13
 The Port Authority v. Bosco, 193 N.J. Super. at 700, 475 A.2d at 678.[2] Third, "the port authority shall be required to pay no taxes or assessments upon any of the property acquired and used by it for any of the purposes of this act." N.J. Stat. Ann. 32:1-35.82 (West Supp. 1986). Thus, under the more rigorous requirements of Blake v. Kline, the Port Authority is clearly an agency of the state and is thus entitled to Eleventh Amendment immunity. Appellants' section 1983 suit against the Port Authority was properly dismissed.
 
 
 14
 The judgment of the district court will be affirmed.
 
 
 
 [1]
 Also of importance to this case is the fact that "members of [the Port Authority] police force shall have all the powers conferred by law on police officers or constables in the enforcement of laws of this state and the apprehension of violators thereof." N.J. Stat. Ann. 32:2-25 (West 1963) (construed in State v. Cohen, 73 N.J. 331, 375 A.2d 259 (1977) (holding that Port Authority police share the power and authority of state police within the Port District)
 
 
 [2]
 Furthermore, the Supreme Court has flatly rejected the proposition that the existence of a sue and be sued provision can, in and of itself, abrogate an agency's Eleventh Amendment immunity. See Florida Dept. of Health and Rehabilitative Serv. v. Florida Nursing Home Ass'n, 450 U.S. 147, 150, 101 S.Ct. 1032, 1034, 67 L.Ed.2d 132 (1981)